THOMAS F. LANDERS [SBN 207335]
tlanders@swsslaw.com
LEAH S. STRICKLAND [SBN 265724]
lstrickland@swsslaw.com
MEI-YING M. IMANAKA [SBN 280472]
mimanaka@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
(t) 619.231.0303

Attorneys for Defendant
MIDLAND CREDIT MANAGEMENT, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKY D. SHADOW, an Individual on behalf of herself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>MIDLAND CREDIT MANAGEMENT, INC.,<br><br>        Defendant. | Case No. 3:17-cv-02277-L-MDD<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT MIDLAND CREDIT MANAGEMENT, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO F.R.C.P. 56**<br><br>Date:      July 8, 2019<br>Time:     10:30 a.m.<br>Courtroom: 5B<br><br>**[No Hearing Pursuant to Local Rules]**<br><br>Judge: Hon. M. James Lorenz<br>Mag. Judge: Hon. Mitchell D. Dembin |

     **TO THE HONORABLE M. JAMES LORENZ, U.S. DISTRICT JUDGE,**

**AND TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL:**

     PLEASE TAKE NOTICE that at a hearing on Defendant MIDLAND

CREDIT MANAGEMENT, INC.'S ("**Midland Credit**") Motion for Summary

Judgment Pursuant to F.R.C.P. 56 ("**Motion**"), scheduled to take place on July 8,

2019, 2019, at 10:30 a.m., or as soon thereafter as the matter may be heard before

the Honorable M. James Lorenz, in Courtroom 5B, of the above-entitled court,

located at Suite 5145, 221 West Broadway, San Diego, California 92101, Midland

1    Credit will, and hereby does, request judicial notice of the facts and records set forth

2    herein pursuant to Federal Rule of Evidence 201:

3        Federal Rule of Evidence, Rule 201(b) states that matters subject to judicial

4    notice include "fact[s]… not subject to reasonable dispute because… [they] can be

5    accurately and readily determined from sources whose accuracy cannot reasonably

6    be questioned." Fed. R. Evid. 201(b). In addition, the court can take judicial notice

7    of documents that are matters of public record. *See e.g., MGIC Indem. Corp. v.*

8    *Weisman,* 803 F.2d 500, 504 (9th Cir. 1986) (a court may take judicial notice of

9    matters of public record); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442

10   F.3d 741, 746 n. 6 (9th Cir. 2006) (court may give judicial notice to court filings and

11   other matters of public record such as pleadings in related litigation). Matters of

12   public record subject to judicial notice include publications from official

13   government websites. *See Corrie v. Caterpillar*, 503 F.3d 974, 978 n.2 (9th Cir.

14   2007).

15                          **<u>REQUEST FOR JUDICIAL NOTICE</u>**

16       Midland Credit requests the Court to take judicial notice of the following

17   documents:

18   A.    2015 CFPB Consent Order, entered in *In the Matter of: Encore Capital*

19         *Group, Inc., Midland Funding, LLC, Midland Credit Management, Inc.*

20         *and Asset Acceptance Capital Corp.,* 2015-CFPB-0022 (Sept. 9, 2015),

21         available at http://files.consumerfinance.gov/f/201509_cfpb_consent-

22         order-encore-capital-group.pdf (last visited June 6, 2019).

23   B.    Consent Decree between the Federal Trade Commission ("**FTC**") and

24         Asset Acceptance LLC, entered in *United States v. Asset Acceptance,*

25         *LLC*, No. 8:12-cv-00182 (M.D. Fla. Jan. 31, 2012), *available at*

26         https://www.ftc.gov/sites/default/files/documents/cases/2012/01/12013

27         1assetconsent.pdf (last visited June 6, 2019).

28

REQUEST FOR JUDICIAL NOTICE I/S/O DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

C.   Relevant excerpts from Federal Trade Commission, Repairing A Broken System (July 2010) ("**2010 FTC Report**"), full document available at https://www.ftc.gov/reports/repairing-broken-system-protecting-consumers-debt-collection-litigation (last visited June 6, 2019).

D.   Relevant excerpts from Small Business Review Panel for Debt Collector and Debt Buyer Rulemaking, Outline of Proposals Under Consideration and Alternatives Considered, dated July 28, 2016 ("**CFPB Outline of Proposals**"), full document available at https://files.consumerfinance.gov/f/documents/20160727_cfpb_Outline_of_proposals.pdf (last visited June 6, 2019).

E.   Senate Judiciary Committee, Report on SB 233 (Leno and Correa) (May 6, 2013), *available at* http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201320140SB233 (last visited June 6, 2019).

F.   Cal. Stats. 2018 ch. 247 (AB 1526), *available at* http://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201720180AB1526 (last visited June 6, 2019).

G.   Legislative history of Texas House Bill 996, 86th Legislature of Texas, TX HB 996 (2019-2020), *available at* https://capitol.texas.gov/BillLookup/History.aspx?LegSess=86R&Bill=HB996 (last visited June 6, 2019).

DATED:  June 6, 2019                SOLOMON WARD SEIDENWURM &
                                    SMITH, LLP


                                    By:  s/ Thomas F. Landers
                                         THOMAS F. LANDERS
                                         LEAH S. STRICKLAND
                                         Attorneys for Defendant MIDLAND
                                         CREDIT MANAGEMENT. INC.

REQUEST FOR JUDICIAL NOTICE I/S/O DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

## UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2015-CFPB-0022

|  |  |
|---|---|
| In the Matter of:<br><br>Encore Capital Group, Inc., Midland Funding, LLC, Midland Credit Management, Inc. and Asset Acceptance Capital Corp., | **CONSENT ORDER** |

## I

## Overview

The Consumer Financial Protection Bureau ("Bureau") has reviewed the practices of Encore Capital Group, Inc. ("Encore Capital"), Midland Funding, LLC ("Midland"), Midland Credit Management, Inc. ("MCM"), and Asset Acceptance Capital Corp. ("Asset")(collectively "Encore" or "Respondents"), regarding its purchase of charged-off Consumer Debts from original Creditors and other Debt buyers, and its subsequent collection efforts including filing lawsuits against Consumers, and has identified violations of Sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 ("CFPA"), 12 U.S.C. §§ 5531(a) and 5536(a)(1); Sections 805(a)(1), 806, 806(5), 807, 807(2)(A), 807(5), 807(8), and 807(10) of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692c(a)(1), 1692d, 1692d(5), 1692e, 1692e(2)(A), 1692e(5), 1692e(8), and 1692e(10); Sections 623(a)(8)(E) and 623(b) of the Fair Credit Reporting

Page 1 of 63

Exhibit A
Page 5

Act ("FCRA"), 15 U.S.C. §§ 1681s-2(a)(8)(E) and 1681s-2(b).  Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

## II

### Jurisdiction

1.      The Bureau has jurisdiction over this matter under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, Section 814(b) of the FDCPA, 15 U.S.C. § 1692l(b), and Section 621(b)(1)(H) of the FCRA, 15 U.S.C. § 1681s(b)(1)(H).

## III

### Stipulation

2.      Respondents have executed a "Stipulation and Consent to the Issuance of a Consent Order," (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondents have consented to the issuance of this Consent Order by the Bureau under Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563 and 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondents admit the facts necessary to establish the Bureau's jurisdiction over Respondents and the subject matter of this action.

## IV

### Definitions

The following definitions must apply to this Consent Order:

3.       "Board" means the duly elected and acting Boards of Directors of Encore Capital Group, Inc., Midland Funding, LLC, Midland Credit Management, Inc., and Asset

Page 2 of 63

Acceptance Capital Corp.

4.      "Charge-off" means the treatment of a receivable balance by a Creditor as a loss or expense because payment is unlikely.

5.      "Charge-off Balance" means the amount alleged due on an account receivable at the time of Charge-off.

6.      "Clearly and prominently" means:

    a.   as to written information, written in a type size and location sufficient for an ordinary Consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary Consumer. If the information is contained in a multi-page print document, the disclosure appears on the first page; and

    b.   as to information presented orally, spoken and disclosed in a volume, cadence and syntax sufficient for an ordinary Consumer to hear and comprehend.

7.      "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

8.      "Creditor" means any person who offers or extends credit creating a Debt or to whom a Debt is owed, but such term does not include any person to the extent that that person receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such Debt for another.

9.      "Debt" means any obligation or alleged obligation of a Consumer to pay

money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

10.  "Effective Date" means the date on which this Consent Order is issued.

11.  "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegee.

12.  "Original Account-Level Documentation" means

    a.  any documentation that a Creditor or that Creditor's agent (such as a servicer) provided to a Consumer about a Debt;

    b.  a complete transactional history of a Debt, created by a Creditor or that Creditor's agent (such as a servicer); or

    c.  a copy of a judgment, awarded to a Creditor or entered on or before the Effective Date.

13.  "Legal Collection" means any collection efforts made by any internal legal department or a third-party law firm to collect a Debt owed or allegedly owed to Encore, including but not limited to sending letters on law firm letterhead and filing Debt collection lawsuits, but does not include any post-judgment collection efforts.

14.  "Encore" means Encore Capital Group, Inc., as well as its current (as of the Effective Date) or former, direct or indirect, affiliates, subsidiaries, parents, divisions, or branches, and all of their successors and assigns, that are directly or indirectly engaged in the purchase, transfer, or collection of U.S. Consumer receivables, including, but not limited to, Midland Funding, LLC, Midland Credit Management, Inc., and Asset

Acceptance Capital Corp.

15.      "Related Consumer Action" means a private action by or on behalf of one or more Consumers or an enforcement action by another government agency brought against Encore based on substantially the same facts as set forth in Section V of this Consent Order.

16.      "Relevant Time Period" means the period from July 21, 2011 to the Effective Date.

17.      "Restitution Eligible Consumer" means any identified Consumer in the population of Consumers identified in Paragraphs 144 and 145 who made a payment, directly or indirectly, to Encore during the Relevant Time Period.

18.      "Time-Barred" when used to describe a Debt means any Debt that is beyond an applicable statute of limitations for a Debt collection lawsuit.

V

**Bureau Findings and Conclusions**

The Bureau finds the following:

19.      Midland, MCM, and Asset are wholly-owned subsidiaries of Encore Capital and share common officers and directors with Encore Capital. Midland and MCM operate in concert with one another, and under the direct supervision and control of Encore Capital, to purchase and collect Consumer Debt on a massive scale. Asset was purchased by Encore in June 2013 and is currently a wholly-owned subsidiary of Encore. Encore is one of the largest Debt buyers and collectors in the United States. From 2009 to 2015, Encore's estimated gross collections totaled over $5 billion, with net income of more than

Page 5 of 63

$384 million.

20.     At all times relevant to this Consent Order, Encore Capital, Midland, MCM, and Asset have collected Debt related to Consumer financial products or services. Accordingly, each Respondent is a "covered person" as defined by the CFPA, 12 U.S.C. § 5481(6).  See also 12 U.S.C. § 5481(5) and (15)(A)(x).  Each Respondent is also a "debt collector" as defined in Section 803(6) of the FDCPA.  15 U.S.C. § 1692a(6). Midland, MCM, and Encore Capital are also each a person who "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies" about Respondents' "transactions or experiences" with Consumers, as described in Section 623(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s-2(a)(2)(A), and are each a "furnisher" as defined in Regulation V, 12 C.F.R. 1022.44(c).

21.     Encore sends collection letters by United States mail, calls Consumers from call centers in the United States, India, and Costa Rica, furnishes Consumer information to credit bureaus, and sues Consumers in state courts across the country. The vast majority of the Debt collection lawsuits Encore files go unanswered by Consumers and result in default judgments.

<u>ENCORE'S DEBT BUYING PRACTICES</u>

22.     Encore purchases portfolios of old Consumer Debt from some of the nation's largest Consumer finance and telecommunications companies, and from other Debt buyers, for pennies on the dollar. These Debts primarily consist of charged-off Consumer credit card and telecommunications Debts, purchased at various points in time from the date of default. From 2009 to 2015, Encore paid about $4 billion for

approximately 60 million Consumer accounts with a total face value of $128 billion.

23.    When Encore purchases Debt portfolios, it has typically received an electronic spreadsheet, sometimes referred to as a "data file," from the seller that includes information about the Consumer, such as name, address, social security number, and information about the Debt, including the purported amount of the Debt, contract interest rate, and dates of origination and default.

### Sellers Disclaim the Accuracy and Enforceability of Debt They Sold to Encore

24.    Encore's purchase agreements with Debt sellers have typically limited, in varying degrees, the seller's responsibility for the accuracy and validity of the accounts in question. For example, a purchase agreement between Midland Funding and one large credit card issuer informed Encore that the account balance for over 35,000 individual accounts being sold in that transaction was an approximation:

> Current balance means the approximate unpaid balance. [Midland Funding] acknowledges that the figure provided as the current balance for any loan may include interest, accrued or unaccrued, costs, fees, and expenses, and it is possible that the figure provided as the current balance for any loan may not reflect credits for payments made by or on behalf of any obligor prior to the cutoff date.

25.    Other purchase agreements, such as one between Midland Funding and a large retailer, put Encore on notice that some of the accounts are likely past the applicable statutes of limitations for litigation or were previously disputed by Consumers:

> [Midland Funding] understands that Sellers believe but have not verified, that the statutes of limitations may have run on some but not all of the accounts.

> [Midland Funding] acknowledges that some accounts or certain transactions posted to some accounts may be subject to actual or potential claims or disputes by obligors against one or both of the Sellers or their affiliates.

26.     In another example, a purchase agreement between Asset and a large finance company informed Encore that:

> [S]ome Accounts, or certain transactions posted to some Accounts, may be subject to actual or potential claims or disputes by Obligors against one or both of the Sellers or their affiliates... [Asset] understands that Sellers believe, but have not verified, that statutes of limitation may have run on some, if not all, of the Accounts.

27.     Debt sellers making these types of disclosures typically did not inform Encore which individual accounts in a given portfolio contain an approximate balance, are past the applicable statute of limitations for litigation, past the date of obsolescence for credit reporting, or were previously disputed by a Consumer.

28.     Debt purchase agreements have typically contained recitals that Encore is purchasing Consumer accounts after having conducted an independent evaluation as to the enforceability and collectability of the sold accounts.

29.     However, the only investigation typically taken by Encore prior to a Debt portfolio purchase has been to review the data file for facial anomalies such as a default date preceding an account open date or a Social Security number that is obviously a placeholder (e.g., made up of all the same numbers).

30.     In numerous instances, Debt sellers have provided data files to Encore containing inaccurate information as to the identity of the Consumer obligated to pay the Debt, the age of the Debt, the amount of the Debt, the interest rate, and other material information about the Debt. Nevertheless, Encore has continued purchasing Consumer Debt from these sellers.

31.     For example, from at least February 2010 to June 2013, one large credit

Page 8 of 63

card bank sold Encore over 10,000 individual Consumer accounts with data files containing overstated interest rates.  To date, Encore has continued to purchase Debt from this bank, knowing that records from this bank have been inaccurate to the detriment of the borrowers, without reviewing any account level documentation to verify that the information being provided by this seller is accurate.

Sellers Disclaim the Availability of Documentation<br>to Evidence the Debt they Sold to Encore

32.     Sellers typically have not provided Encore with any Consumer-level documentation about most individual Debts, such as account statements, records of payments, and the underlying contracts signed by the Consumers. Instead, if desired, Encore has had to order these documents from sellers, often at an additional cost to Encore.

33.     Further, purchase agreements typically state that sellers will provide documentation to evidence the Debt only "to the extent it is available." Some purchase agreements state that the seller will not provide any account level documents for certain portfolios or that documentation is available for only a percentage of the accounts and that sellers will not be in breach of their agreement with Encore because they cannot provide documentation.

34.     When Debt sellers have informed Encore in purchase agreements that documentation is only available for some accounts, they did not inform Encore which individual accounts in a given portfolio cannot be supported by account-level documentation.

35.     In numerous instances, sellers have been unable to provide documentation

to Encore evidencing Consumers' responsibility for Debt Encore was collecting. Nevertheless, Encore has continued purchasing Consumer Debt from these sellers and collecting on that Debt without first conducting any investigation to determine whether the information in the data files is accurate.

## ENCORE'S PRACTICES RELATING TO CONSUMER DISPUTES

36.     Encore has received an average of 30,000 written disputes and complaints and 10,000 oral disputes and complaints directly from Consumers in a typical month relating to Encore's Debt collection and credit reporting. Another approximately 100,000 Consumer disputes have come to Encore in a typical month through e-OSCAR, the web-based communications system used by the nationwide Consumer reporting agencies to communicate with data furnishers regarding Consumer disputes.

37.     Encore has generally relied on Consumers to inform Encore when it was attempting to collect Debt based on inaccurate or erroneous information. It has required Consumers to report such disputes in writing within 45 days after Encore sends them a notice of Debt under Section 809 of the FDCPA ("Notice of Debt").  According to Encore's written policies and procedures, Encore requests account-level documentation from the seller of the Debt if Encore receives a written dispute from a Consumer within 45 days of sending a Notice of Debt.

38.     Encore has considered disputes received outside of 45 days "untimely" and has directed personnel responsible for handling these disputes not to investigate the disputes by requesting documentation from sellers but rather to "[i]nform the consumer that proof is required to support their claim."

Page 10 of 63

39.     Before Encore has investigated "untimely" claims that the Consumer previously paid the Debt, Encore has required the Consumer to produce a copy of a letter from a previous Debt owner stating that the Debt had been paid or settled, or a copy of the front and back of a canceled check along with a copy of a settlement offer in the same amount.

40.     Before Encore has investigated "untimely" claims that Encore was collecting an inaccurate amount, Encore has required the Consumer to produce a letter of investigation from the original Creditor, a copy of correspondence between the Consumer's attorney and the original Creditor, or a copy of account-level documentation, such as a monthly credit card statement dated after the account was charged-off, showing the balance alleged by the Consumer.

41.     Before Encore has investigated "untimely" claims that Encore is collecting from the wrong person, Encore has required the Consumer to produce a notarized affidavit swearing that the Consumer is a victim of identity theft, a police report, or a letter from the credit issuer determining that there was a fraud on the account.

42.     In numerous instances, Encore has told Consumers submitting "untimely" disputes that under the FDCPA, the Consumer has the burden of proving that he or she does not owe a Debt. Encore has often made this representation while threatening legal action and in response to disputes made under the FCRA.

43.     Encore collects disputed Debt itself and also assigns disputed Debt to law firms and third-party Debt collectors. In numerous instances, Encore has assigned disputed Debt to law firms and third-party Debt collectors without informing them that

the Debt is disputed and without forwarding correspondence it has received from
Consumers in support of their disputes. As a result, law firms evaluating Encore accounts
for litigation did not know which accounts are disputed, and disputing Consumers have
been forced to re-start the dispute process each time Encore transfers a Debt.

44.    In numerous instances, Encore has instructed its law firms to abide by its
dispute policies and only to close accounts with "untimely" disputes if the Consumer
provides proof that he or she does not owe the Debt. This is even the case where
documentation produced to Encore by a seller indicates that the Consumer does not owe
a Debt. For example, Encore instructed one law firm to continue collecting on more than
fifty accounts unless the Consumers could provide independent proof that the accounts
had been paid, even though the monthly statements provided by the Debt sellers showed
a zero balance.

<u>ENCORE COLLECTS DEBT WITHOUT A REASONABLE BASIS</u>

45.    Despite the indicators described above regarding the inaccuracy of
information produced by Debt sellers, Encore has generally relied upon the summary
data files as the sole basis for its collection efforts and has only attempted to obtain
account-level documentation evidencing the Debt in certain limited circumstances. Even
when Encore has already been in possession of account-level documentation regarding
the Debts it has collected, Encore generally did not review the documentation to ensure it
was consistent with information in the data file.

46.    Encore has made the same claims to Consumers regarding Debt purchased
from portfolios Encore has had reason to believe may contain inaccurate information as it

Page 12 of 63

did regarding Debt purchased from more reliable sources. Encore has made the same claims to Consumers regarding Debt that Encore knew or had reason to believe cannot be supported by account-level documentation available to Encore as it did regarding Debt that can be supported by such documentation.

47.    Consumers being contacted by Encore regarding these Debts did not know that Encore knew or had reason to believe the information forming the basis for the claim may be inaccurate or unsupportable by underlying documentation. Consumers contacted by Encore regarding these Debts did not know when Encore knew or had reason to believe it lacked access to account-level documentation to support the claim.

## ENCORE'S LITIGATION PRACTICES
### Scattershot Litigation

48.    Encore has filed hundreds of thousands of lawsuits to collect Consumer Debt. Most of the Consumers sued by Encore are not represented by counsel. Encore has placed tens of thousands of accounts with law firms staffed by fewer than ten attorneys. For example, Encore placed over 100,000 accounts with Frederick J. Hanna and Associates, while that firm employed 16 attorneys. Encore has encouraged these law firms to file lawsuits on a large percentage of accounts, prohibited them from contacting previous owners of the Debt for account-level documentation, and discouraged them from requesting account-level documentation Encore did not deem necessary to settle a case or obtain a judgment.

49.    Prior to Encore Capital's purchase of Asset, much of Asset's legal collections were handled by a 24 attorney Debt collection law firm that operates in 12 states. This firm collected over $50,000,000 for Asset from October 2011 to October 2012, while

suing or threatening to sue approximately half a million Consumers allegedly indebted to Asset.

50.     When deciding whether to threaten or file suit, Encore's law firms have not known if a Debt seller has specifically disclaimed the accuracy of information in the data file, has notified Encore that documentation is unavailable or has notified Encore that a number of accounts in a portfolio are disputed or barred by the applicable statute of limitations. Law firms also have not known if the Consumer had disputed the Debt with Encore or provided detailed letters or documentary evidence questioning the validity of Encore's claim.

51.     In most states, Encore has threatened and filed suit before verifying that account-level documentation exists to substantiate its claim in court. In numerous instances, Encore has filed suit after requests for account-level documentation have been denied.

52.     Even when Encore has been able to obtain account-level documentation, that evidence is sometimes unreliable or inconsistent with information in the data file, or with the facts alleged in Encore's lawsuits.

53.     When Consumers have contested Encore's claims and Encore has lacked the account-level documentation necessary to obtain a judgment, Encore has instructed its attorneys to make one final attempt to convince the Consumer to settle before dismissing the claim.

<u>Misleading Affidavits</u>

54.     In many jurisdictions, Encore has been able to obtain a settlement or a

Page 14 of 63

default judgment against a Consumer using an affidavit as its only evidence. Many of these affidavits contain false or misleading testimony.

55.    For example, from at least 2011 to 2014, Encore has obtained tens of thousands of judgments against Consumers by submitting sworn affidavits representing that the Consumer defendants did not file a timely written dispute pursuant to Section 809 of the FDCPA and stating that pursuant to the FDCPA, the Debt is therefore "assumed valid."

56.    In fact, Section 809(a)(3) of the FDCPA states that a Debt collector's Notice of Debt must inform a Consumer that Debts will be "assumed to be valid *by the debt collector*" (emphasis added) if they are not disputed pursuant to that section. Section 809(c) of the FDCPA expressly states that "[t]he failure of a consumer to dispute the validity of a debt [after receiving a notice under Section 809 from the collector] may not be construed by any court as an admission of liability by the consumer." 15 U.S.C. § 1692g(c).

57.    In thousands of cases, for which Encore possessed no account-level documentation evidencing the Consumer's responsibility for the Debt, Encore obtained a settlement or judgement based solely on an affidavit referencing the Consumer's failure to dispute the Debt.

58.    Encore has routinely submitted affidavits without attaching supporting documentation, in which the affiant swears that he or she has reviewed account-level business records concerning the Consumer's account when that is not the case.

59.    However, in most instances, these representations have been made when

affiants have merely reviewed a computer screen containing the scant information produced by sellers in data files and not after a review of any account level documents such as account applications, terms and conditions of contracts, payment histories, monthly credit card statements, charge slips, or bills of sale reflecting Encore's ownership of the account.

60.    Encore has routinely requested and used affidavits from sellers that contain false or misleading statements regarding the seller's review of unattached records.  For example, numerous Encore purchase agreements with credit issuers and other Debt buyers provide that "[i]n the event Seller does not provide any of the account documents on a particular account, [Encore] may request an affidavit" containing the following language: "The statements in this affidavit are based on the computerized and *hard copy records* of the Seller…" (emphasis added).

61.    According to an Encore senior manager responsible for negotiating Debt purchase agreements, the ability to request affidavits from sellers that purport to be based on a review of documentation is negotiated by Encore "[a]s a safeguard, should documentation not exist, [so] we have some form of evidence from the seller." A director of Encore's Debt purchasing department has instructed Encore management to "reinforce that these affidavits are intended to provide documentation when other media is not available."

62.    Encore has routinely submitted business records affidavits in which affiants swear that attached documentation relates to individual Consumers' accounts.

63.    However, in many instances, the attached documentation, which sometimes

Page 16 of 63

included generic credit card agreements created years after the Consumer purportedly
defaulted on the agreement, does not in fact relate to the Consumer being sued.

64.    Finally, in numerous instances from at least 2009 to 2011, Encore
submitted affidavits in which affiants misrepresented that they had personal knowledge
of facts contained in affidavits, including that the Consumer owed a Debt.

## ENCORE'S COLLECTION OF TIME-BARRED DEBT

65.    Encore and its law firms typically have failed to review account-level
documents to determine the age of the accounts they collect, relying solely on information
in the data file, even if Encore or one of its law firms has been on notice that some of the
information in a data file is inaccurate or if Encore has known that some of the Debts in a
specific portfolio are barred by the applicable statute of limitations.

66.    In numerous instances, Encore has threatened and filed suit on Debt that
was past the applicable statute of limitations.

67.    Encore has not tracked when Consumers assert limitations defenses or how
often any of its third-party law firms file lawsuits outside the applicable statute of
limitations.

68.    Encore has trained its collectors to "create urgency" when collecting Time-
Barred Debt through telephone calls. For example, for one portfolio Encore knew
contained a high percentage of Time-Barred Debt, collectors were instructed to "[e]ducate
[the] consumer, as to how nonpayment of bill will impact him," by telling him "[i]t is
important for me to establish your intentions towards the bill or else it will be taken as
your refusal to resolve" after which the account will be "forwarded for further

Page 17 of 63

management review" so that "further collection activities will be decided."

69.     In numerous instances from at least July 21, 2011 to March 31, 2013, Encore sent thousands of letters containing time-limited "settlement" offers that failed to disclose that the Debt it was collecting was too old for litigation and that implied a legally enforceable obligation to pay the Debt.

### ASSET'S HARASSING TELEPHONE CALLS TO CONSUMERS

70.     In numerous instances, from 2009 to 2014, Asset has called Consumers repeatedly or continuously. Such calls had the effect of abusing or harassing consumers or other persons at the called numbers.  For example, Asset called numerous Consumers more than 20 times over just one two day period.

71.     In numerous instances, from 2009 to 2014, Asset called Consumers at a time it knew or should have known to be inconvenient to the Consumer, such as early in the morning or late at night. For example, Asset made thousands of calls to Consumers before 8:00 a.m. or after 9:00 p.m., in the time zones associated with the addresses on file in Asset's own records.

72.     Asset's continuous and inconvenient calls caused, or were likely to cause, Consumers to suffer emotional distress. Some Consumers, including those who disputed the Debt, made, or were likely to have made, payments to Asset solely to temporarily stop the excessive and inconvenient calls. As a result of Asset's excessive and inconvenient calls, Consumers who lacked the ability to repay Asset while meeting their other financial obligations, placed, or were likely to have placed, a higher priority on unsecured old credit card Debt than on expenses for monthly living expenses.

## Violations of the Consumer Financial Protection Act

73.    Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531 and 5536(a)(1)(B).

74.    Encore Capital, Midland, MCM, and Asset are each a "covered person" within the meaning of the CFPA, 12 U.S.C. § 5481(6).

75.    Respondents made numerous representations to Consumers in connection with attempting to collect Debts, a Consumer financial product or service, 12 U.S.C. §§ 5481(5), (15)(x).

76.    An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a Consumer acting reasonably under the circumstances.

77.    An act or practice is unfair under the CFPA if (1) it causes or is likely to cause substantial injury to Consumers; (2) such injury is not reasonably avoidable by Consumers; and (3) such injury is not outweighed by countervailing benefits to Consumers or to competition.

### False or Unsubstantiated Representations About Owing a Debt

78.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers owed Debts to Encore with certain unpaid balances, interest rates, and payment due dates. Encore further represented to Consumers directly or indirectly, expressly or by implication, that Encore had a reasonable basis for representing that Consumers owed the claimed Debts to Encore.

79.     In truth and in fact, in numerous instances the representations set forth in Paragraph 78 were false or were not substantiated at the time the representations were made, including but not limited to where:

    a.    Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Encore failed to review information that would have been necessary to have a reasonable basis to continue collecting on that account; or

    b.    Encore had knowledge or reason to believe, based on Encore's past course of dealing with the seller or the seller's accounts (including factors such as Consumer disputes, inaccurate or incomplete information in the portfolio, and contractual disclaimers related to the accounts) that a specific portfolio of the seller's accounts might contain unreliable data, but continued to represent that Consumers owed the claimed amount on the accounts in question without obtaining and reviewing additional information that would provide a reasonable basis for such claims.

80.     The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt and are likely to mislead Consumers acting reasonably under the circumstances.

81.     The representations set forth in Paragraph 78 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

## Misrepresenting that Encore Intends to Prove the Debt, If Contested

82.     In numerous instances, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Encore represented, directly or indirectly, expressly or by implication, that Encore intends to

prove its claims, if contested.

83.     In truth and in fact, in numerous instances, Encore does not intend to prove its claims, if contested.

84.     These representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

85.     The representations set forth in Paragraph 82 are false or misleading and constitute deceptive acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Filing Misleading Collection Affidavits

86.     In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, in affidavits filed in courts across the country, Encore represented directly or indirectly, expressly or by implication, that:

    a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are presumed valid by a court;
    b.    Encore affiants had reviewed account-level documentation from the original Creditor corroborating the Consumer's Debt;
    c.    Debt seller affiants had reviewed hard copy records corroborating the Consumer's Debt;
    d.    Documents attached to affidavits were specific to the Consumer; or
    e.    Encore affiants had personal knowledge of the individual Consumer's indebtedness.

87.     In truth and in fact:

    a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are not presumed valid by a court, because pursuant to Section 809(c) of the

Page 21 of 63

FDCPA, "[t]he failure of a consumer to dispute the validity of a debt [after receiving a notice under Section 809] may not be construed by any court as an admission of liability by the consumer";

b.   In numerous instances, Encore affiants had not reviewed account-level documentation from the original Creditor corroborating the Consumer's Debt;

c.   In numerous instances, Debt seller affiants had not reviewed hard copy records corroborating the Consumer's Debt;

d.   In numerous instances, documentation attached to affidavits was not specific to the Consumer; and

e.   In numerous instances, Encore affiants did not have personal knowledge of the individual Consumer defendant's indebtedness.

88.   These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

89.   The representations set forth in Paragraph 86 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresentations Regarding Time-Barred Debt

90.   In numerous instances, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

91.   In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

Page 22 of 63

92.    These representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to an allegedly outstanding Debt claim and are likely to mislead Consumers acting reasonably under the circumstances.

93.    The representations set forth in Paragraph 90 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Misrepresenting to Consumers That They Have the Burden of Proof in Litigation

94.    In numerous instances, in connection with collecting or attempting to collect Debt through litigation or threats of litigation, Encore represented to Consumers, directly or indirectly, expressly or by implication, that under the FDCPA, the failure to dispute a Debt in writing within a certain period of time shifts the legal burden to Consumers to prove in court that they do not owe a Debt to Encore.

95.    In truth and in fact, under the FDCPA, the failure to dispute a Debt in writing within a certain period of time does not shift the legal burden to Consumers to prove in court that they do not owe a Debt.

96.    The representations are material because they are likely to affect a Consumer's choice or conduct regarding whether to pay the Debt or contest the lawsuit and are likely to mislead Consumers acting reasonably under the circumstances.

97.    The representations set forth in Paragraph 94 are false or misleading and constitute a deceptive act or practice in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Excessive and Inconvenient Calls

98.     In numerous instances, in connection with collecting or attempting to collect Debt, Asset made an excessive number of telephone calls to Consumers and made calls at times Asset knew or should have known were inconvenient to Consumers.

99.     The acts or practices set forth in Paragraph 98 caused or were likely to cause substantial injury that was not reasonably avoidable by Consumers or outweighed by countervailing benefits to Consumers or to competition and constitute unfair acts or practices in violation of Sections 1031(a) and 1036(a) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a).

### Violations of the Fair Debt Collection Practices Act

100.     Section 805(a)(1) of the FDCPA, 15 U.S.C. § 1692c(a)(1), prohibits Debt collectors from communicating with Consumers in connection with the collection of any Debt at any unusual time or place or a time or place known or which should be known to be inconvenient to the Consumer.  Section 806 of the FDCPA, 15 U.S.C. § 1692d, prohibits Debt collectors from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a Debt. Section 806(5) of the FDCPA, 15 U.S.C. § 1692d(5), specifically prohibits Debt collectors from causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number. Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits Debt collectors from using any false, deceptive, or misleading representation or means in connection with the collection of any Debt. Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A) specifically prohibits the false representations of the character, amount, or legal status of

any Debt. Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5) specifically prohibits the

threat to take any action that cannot legally be taken or that is not intended to be taken.

Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8), prohibits communicating or

threatening to communicate to any person credit information that is known or which

should be known to be false, including the failure to communicate that a disputed Debt is

disputed. Section 807(10) of the FDCPA, 15 U.S.C. § 1692e(10), prohibits using false

representations or deceptive means to collect or attempt to collect any Debt or to obtain

information concerning a Consumer.

101.    Midland, MCM, Asset, and Encore Capital are each a "debt collector" within

the meaning of the FDCPA, 15 U.S.C. § 1692a(6).

102.    Encore made numerous telephone calls and representations to Consumers

in connection with attempting to collect Debts arising out of transactions primarily for

personal, family, or household purposes.

### False or Unsubstantiated Representations About Owing a Debt

103.    In numerous instances, in connection with collecting or attempting to

collect Debt from Consumers, Encore represented, directly or indirectly, expressly or by

implication, that Consumers owed Debts to Encore with certain unpaid balances, interest

rates, and payment due dates. Encore further represented to Consumers directly or

indirectly, expressly or by implication, that Encore had a reasonable basis for

representing that Consumers owed the claimed Debts to Encore.

104.    In truth and in fact, in numerous instances the representations set forth in

Paragraph 103 were false or were not substantiated at the time the representations were

Page 25 of 63

made, including but not limited to where:

    a.    Consumers disputed, challenged, or questioned the validity or accuracy of the Debt and Encore failed to review information that would have been necessary to have a reasonable basis to continue collecting on that account; or

    b.    Encore had knowledge or reason to believe, based on Encore's past course of dealing with the seller or the seller's accounts (including factors such as Consumer disputes, inaccurate or incomplete information in the portfolio, and contractual disclaimers related to the accounts) that a specific portfolio of the seller's accounts might contain unreliable data, but continued to represent that Consumers owed the claimed amount on the accounts in question without obtaining and reviewing additional information that would provide a reasonable basis for such claims.

105.    The representations set forth in Paragraph 103 are false or misleading and constitute deceptive acts or practices in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Misrepresenting that Encore Intends to Prove the Debt, If Contested

106.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers through litigation or threats of litigation, Encore represented, directly or indirectly, expressly or by implication, that Encore intends to prove its claims, if contested.

107.    In truth and in fact, in numerous instances, Encore does not intend to prove its claims, if contested.

108.    The representations set forth in Paragraph 106 are false or misleading and

constitute deceptive acts or practices in violation of Sections 807, 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(5), 1692e(10).

### Filing Misleading Collection Affidavits

109.    In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, in affidavits filed in courts across the country, Encore represented directly or indirectly, expressly or by implication, that:

a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are presumed valid by a court;

b.    Encore affiants had reviewed account-level documentation from the original Creditor corroborating the Consumer's Debt;

c.    Debt seller affiants had reviewed hard copy records corroborating the Consumer's Debt;

d.    Documents attached to affidavits were specific to the Consumer; or

e.    Encore affiants had personal knowledge of the individual Consumer's indebtedness.

110.    In truth and in fact:

a.    Debts not disputed pursuant to Section 809(a)(3) of the FDCPA are not presumed valid by a court, because pursuant to Section 809(c) of the FDCPA, "[t]he failure of a consumer to dispute the validity of a debt [after receiving a notice under Section 809] may not be construed by any court as an admission of liability by the consumer";

b.    In numerous instances, Encore affiants had not reviewed account-level documentation from the original Creditor corroborating the Consumer's Debt;

c.    In numerous instances, Debt seller affiants had not reviewed hard copy records corroborating the Consumer's Debt;

d.      In numerous instances, Documentation attached to affidavits was not specific to the Consumer; and

e.      In numerous instances, Encore affiants did not have personal knowledge of the individual Consumer defendant's indebtedness.

111.    The representations set forth in Paragraph 109 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Misrepresentations Regarding Time-Barred Debt

112.    In numerous instances, in connection with collecting or attempting to collect Debt that is beyond the applicable statute of limitations from Consumers, Encore represented, directly or indirectly, expressly or by implication, that Consumers had a legally enforceable obligation to pay the Debt.

113.    In truth and in fact, Consumers do not have a legally enforceable obligation to pay Debt that is beyond the applicable statute of limitations.

114.    The representations set forth in Paragraph 112 are false or misleading and constitute a deceptive act or practice in violation of Sections 807, 807(2)(A), 807(5), and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10).

### Misrepresenting to Consumers That They Have the Burden of Proof in Litigation

115.    In numerous instances, in connection with collecting or attempting to collect Debt through litigation or threats of litigation, Encore represented to Consumers, directly or indirectly, expressly or by implication, that under the FDCPA, the failure to dispute a Debt in writing within a certain period of time shifts the legal burden to Consumers to prove in court that they do not owe a Debt to Encore.

116.    In truth and in fact, under the FDCPA, the failure to dispute a Debt in writing within a certain period of time does not shift the legal burden to Consumers to prove in court that they do not owe a Debt.

117.    The representations set forth in Paragraph 115 are false or misleading and constitute a deceptive act or practice in violation in violation of Sections 807 and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10).

### Assigning Disputed Debt to Third Parties
### Without Communicating that the Debt is Disputed

118.    In numerous instances, in connection with collecting or attempting to collect Debt, Encore communicated disputed credit information to third-party collection agencies, including law firms, without communicating that the Debt is disputed.

119.    The representations set forth in Paragraph 118 are false or misleading and constitute violations of Sections 807 and 807(8) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(8).

### Excessive Calls

120.    In numerous instances, in connection with collecting or attempting to collect Debt, Asset made an excessive number of telephone calls and engaged in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a Debt.

121.    The acts or practices set forth in Paragraph 120 are harassing or abusive and constitute violations of Sections 806 and 806(5) of the FDCPA, 15 U.S.C. §§ 1692d, 1692d(5).

### Calls at Inconvenient Times

Page 29 of 63

122.    In numerous instances, in connection with collecting or attempting to collect Debt, Asset called certain Consumers at unusual times or at a time which Asset should have known would be inconvenient.

123.    The representations set forth in Paragraph 122 constitute violations of Sections 805(a)(1) of the FDCPA, 15 U.S.C. § 1692c(a)(1).

### Violation of the Fair Credit Reporting Act

124.    Section 623 (b)(1)(A) of the FCRA makes it unlawful for a furnisher of information to a Consumer reporting agency, upon receiving notice of a Consumer dispute from the Consumer reporting agency, not to conduct a reasonable investigation of the disputed information. 15 U.S.C. § 1681s-2(b).  Section 623(a)(8)(E) of the FCRA makes it unlawful for such a furnisher not to conduct a reasonable investigation of a Consumer dispute received directly from the Consumer, in the circumstances specified by Regulation V.  15 U.S.C. § 1681s-2(a)(8)(E); 12 C.F.R. 1022.43.

125.    Midland, MCM, and Encore Capital each "regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies" about the Encore's "transactions or experiences" with Consumers, as described in Section 623(a)(2)(A) of the FCRA, 15 U.S.C. § 1681s-2(a)(2)(A), and are each a "furnisher" as defined in Regulation V, 12 C.F.R. 1022.44(c).

### Failing to Adequately Investigate Disputes

126.    In numerous instances, Encore failed to conduct reasonable investigations of Consumer disputes under the FCRA for accounts that had not been disputed within 45 days of Encore sending the Consumer a Notice of Debt under Section 809 of the FDCPA.

Page 30 of 63

127.    The acts or practices alleged in Paragraph 126 constitute violations of

Sections 623(a)(8)(E) and (b)(1)(A) of the FCRA, 15 U.S.C. §§ 1681s-2(a)(8)(E) and (b).

## ORDER

## VI

## Conduct Provisions

**IT IS ORDERED, under Sections 1053 and 1055 of the CFPA, that:**

128.    Respondent and its officers, agents, servants, employees, and attorneys who

have actual notice of this Consent Order, whether acting directly or indirectly, may not

violate Sections 1031(a) and 1036(a)(1) of the CFPA, 12 U.S.C. §§ 5531(a) and 5536(a)(1);

Sections 805(a)(1), 806, 806(5), 807, 807(2)(A), 807(5), 807(8), and 807(10) of the

FDCPA, 15 U.S.C. §§ 1692c(a)(1), 1692d, 1692d(5), 1692e, 1692e(2)(A), 1692(5), 1692(8),

and 1692(10); Sections 623(a)(8)(E) and 623(b) of the FCRA, 15 U.S.C. §§ 1681s-

2(a)(8)(E) and 1681s-2(b).

## PROHIBITION AGAINST COLLECTING DEBTS
## WITHOUT A REASONABLE BASIS

**IT IS FURTHER ORDERED** that:

129.    Encore, Encore's officers, agents, servants, employees, and attorneys, and

all other persons in active concert or participation with any of them, who receive actual

notice of this Consent Order, whether acting directly or indirectly, are permanently

restrained and prohibited from making any representation, expressly or by implication,

that a Consumer owes a Debt to Encore or as to the amount of a Debt owed or allegedly

owed to Encore unless, at the time of making the representation, Encore can substantiate

the representation. Without limiting the foregoing, such substantiation must include

reviewing Original Account-Level Documentation reflecting the Consumer's name and the claimed amount, excluding any post Charge-off or post-judgment payments (unless the claimed amount is higher than the Charge-off Balance or judgment balance, in which case Encore must review (i) Original Account-Level Documentation reflecting the Charge-off Balance or judgment balance and (ii) an explanation of how the claimed amount was calculated and why such increase is authorized by the agreement creating the Debt or permitted by law), under any of the following circumstances:

    a. The Consumer disputed, orally or in writing, the accuracy or validity of the Debt;

    b. The Debt was purchased, after the Effective Date, through a purchase agreement without meaningful and effective representations and warranties as to the accuracy or validity of the Debt;

    c. The Debt was purchased, after the Effective Date, through a purchase agreement without meaningful and effective commitments to provide Original Account-Level Documentation during the time period in which Encore is collecting the Debt; or

    d. The Debt was purchased in a portfolio, after the Effective Date, which Encore knows contains unsupportable or materially inaccurate information about any Debt, based on either of the following factors:

        i. At any time during the preceding twelve months, a Consumer disputed, orally or in writing, the accuracy or validity of a Debt in the portfolio and Encore sought but was unable to obtain Original

Page 32 of 63

Account-Level Documentation reflecting the amount of the Debt or the identity of the person responsible for the Debt, unless Encore can establish, based on a documented and thorough review of Original Account-Level Documentation concerning other accounts in the portfolio, that the inability to obtain Original Account-Level Documentation to support the account in the portfolio was an anomaly; or

ii. Original Account-Level Documentation produced to Encore, by a Debt seller or a Consumer, reflected information about the amount of the Debt or the identity of the person responsible for the Debt that was inconsistent and irreconcilable with information previously provided to Encore by the Debt seller, unless Encore can establish, based on a documented and thorough review of Original Account-Level Documentation concerning other accounts in the portfolio, that the production of inaccurate or inconsistent information concerning the account in the portfolio was an anomaly.

Notwithstanding the foregoing, Encore is not required pursuant to this Paragraph to (i) refuse to accept any payments voluntarily submitted by Consumers; (ii) suspend collections for Consumers who have acknowledged the Debt and agreed to make payments; or (iii) refuse to communicate with a Consumer who affirmatively contacts Encore (or Encore's agents) or requests contact from Encore (or Encore's agents) to discuss the Consumer's account.

Page 33 of 63

## PROHIBITION AGAINST SELLING DEBT

**IT IS FURTHER ORDERED** that:

130.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from reselling Debt to anyone other than (i) the entity that initially sold the Debt to Encore or to the Creditor; (ii) to a subsidiary or affiliate of Encore that is subject to the terms of this Consent Order (either by operation of law or by agreement); (iii) to any entity that is subject to  the terms of this Consent Order as part of an  acquisition  or merger with Encore, or purchase of all or substantially all of Encore's assets; or (iv) Encore's (or its affiliates) creditors or any agent of such creditors  (in each case, solely in their capacity as such) in settlement or satisfaction of any claims under, or in connection with the default or remedial provisions of, any relevant loan or lending agreement.

## PROHIBITION AGAINST THREATENING OR FILING COLLECTION LAWSUITS WITHOUT AN INTENT TO PROVE THE DEBT, IF CONTESTED

**IT IS FURTHER ORDERED** that:

131.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

>     a.  Initiating a Legal Collection lawsuit unless in possession of the

Page 34 of 63

following:

i. Original Account-Level Documentation reflecting, at a minimum, the Consumer's name, the last four digits of the account number associated with the Debt at the time of Charge-off, the claimed amount, excluding any post Charge-off payments (unless the claimed amount is higher that the Charge-off Balance, in which case Encore must possess (i) Original Account-Level Documentation reflecting the Charge-off Balance and (ii) an explanation of how the claimed amount was calculated and why such increase is authorized by the agreement creating the Debt or permitted by law), and if Encore is suing under a breach of contract theory, the contractual terms and conditions applicable to the Debt;

ii. A chronological listing of the names of all prior owners of the Debt and the date of each transfer of ownership of the Debt, beginning with the name of the Creditor at the time of Charge-off;

iii. A certified or otherwise properly authenticated copy of each bill of sale or other document evidencing the transfer of ownership of the Debt at the time of Charge-off to each successive owner, including Encore. Each of the documents evidencing the transfer of ownership of the Debt must include a specific reference to the particular Debt being collected upon; and

iv. Any one of the following:

Page 35 of 63

      1. A document signed by the Consumer evidencing the opening of the account forming the basis for the Debt; or

      2. Original Account-Level Documentation reflecting a purchase, payment, or other actual use of the account by the Consumer.

b. Engaging in any Legal Collection without providing the Consumer with certain information about the Debt, unless previously provided, including but not limited to, the following information:

    i. the name of the Creditor at the time of Charge-off, including the name under which the Creditor did business with the Consumer;

    ii. the last four digits of the account number associated with the Debt at the time of the Consumer's last monthly account statement, or, if not available, at the time of Charge-off;

    iii. the Charge-off Balance;

    iv. Encore's method of calculating any amount claimed in excess of the Charge-off Balance; and

    v. A statement that Encore, or Encore's agent, will, within 30 days of a written request, provide the Consumer with copies of the documentation referenced in Subsection (a) of this Paragraph, at no cost. *Provided that,* Encore has to provide such documentation upon request only once per year and that Encore is not required to provide such documentation in response to a request made more than one year after Encore has ceased collecting the Debt.

Page 36 of 63

2015-CFPB-0022   Document 1   Filed 09/09/2015   Page 37 of 63

**PROHIBITION AGAINST FILING FALSE OR MISLEADING AFFIDAVITS**

**IT IS FURTHER ORDERED** that:

132.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with collection of a Debt:

    a. Submitting any affidavit in which the affiant represents, expressly or by implication, that the affidavit has been notarized if the affidavit was not executed in the presence of a notary;

    b. Submitting any affidavit containing an inaccurate statement, including but not limited to a statement that attached documentation relates to the specific Consumer being sued when that is not the case;

    c. Submitting any affidavit in which the affiant represents, expressly or by implication, that any attached or unattached documents or records concerning the Debt forming the basis for the lawsuit have been reviewed by the affiant, when that is not the case;

    d. Submitting any affidavit in which the affiant represents, expressly or by implication, that the affiant has personally reviewed the affidavit, when that is not the case;

    e. Submitting any affidavit which references a Consumer's failure to dispute a Debt unless the affidavit also contains the following statement:

Page 37 of 63

Under Federal law, "[t]he failure to dispute a debt under [Section 809(c) of the Fair Debt Collection Practices Act, 15 U.S.C. §1692g(c)] may not be considered by any court as an admission of liability."

## PROHIBITION AGAINST DECEPTIVELY COLLECTING TIME-BARRED DEBT

**IT IS FURTHER ORDERED** that:

133.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

    a. Collecting or attempting to collect any Time-Barred Debt through litigation or arbitration;

    b. Collecting or attempting to collect any Time-Barred Debt through any means, including but not limited to telephone calls and written communications, without clearly and prominently disclosing to the Consumer:

      i. for those Consumer accounts where the Debt is Time-Barred and generally cannot be included in a Consumer report under the provisions of the FCRA, 15 U.S.C. § 1681c(a), but can be collected through other means pursuant to applicable state law, Encore will include the following statement: "The law limits how long you can be sued on a debt and how long a debt can appear on your credit report. Due to the age of this debt, we will not sue you for it or report

Page 38 of 63

payment or non-payment of it to a credit bureau;" and

    ii. for those Consumer accounts where the Debt is Time-Barred but can be collected through other means pursuant to applicable state law, and may be included in a Consumer report under the provisions of the FCRA, 5 U.S.C. § 1681c(a), Encore will include the following statement: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it."

Provided, however, that with regard to telephonic communications, Encore is not required to make either disclosure to any individual person more than once per 30 day period.

    c. Making any representation or statement, or taking any other action that interferes with, detracts from, contradicts, or otherwise undermines the disclosures required in Paragraph (b) of this Section.

Encore will be deemed to have complied with the disclosure requirements of this Paragraph if it makes a disclosure to Consumers in a specific jurisdiction that (i) is required by the laws or regulations of that jurisdiction, (ii) complies with those laws or regulations, and (iii) is substantially similar to the disclosure required by this Paragraph.

### PROHIBITION AGAINST FAILING TO COMMUNICATE DISPUTES

**IT IS FURTHER ORDERED** that

134.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently

Page 39 of 63

restrained and prohibited from communicating any information about a Debt that Encore knows or should know is disputed, to any person without informing such person that the Debt is disputed, including but not limited to communications with third-party collection agencies, law firms employed by Encore, or Consumer reporting agencies provided, however, that Encore is not required by this Consent Order to provide oral notification under this Sub-Paragraph to any individual person more than once per 30 day period.

## PROHIBITION AGAINST EXCESSIVE AND INCONVENIENT TELEPHONE CALLS

**IT IS FURTHER ORDERED** that

135.    Encore, Encore's officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from:

> a.  Engaging in any conduct the natural consequence of which is to harass, oppress, or abuse a person, including, but not limited to: (1) the use of obscene or profane language or language the natural consequence of which is to abuse the hearer; (2) causing a telephone to ring, or engaging a person in telephone conversation, repeatedly or continuously with the intent to annoy, abuse, or harass the person at the called number; (3) placing more than one call to any person about a Debt after that person has notified Encore either orally or in writing that the person wishes Respondent to cease further communication with the person; and

Page 40 of 63

b.   Communicating with any Consumer at a time or place known by Encore or which should be known by Encore to be inconvenient to the Consumer. In the absence of knowledge of circumstances to the contrary, Encore must assume that the convenient time for communicating with a Consumer is after 8:00 a.m. and before 9:00 p.m., local time at the Consumer's location. In the absence of knowledge of circumstances to the contrary, Encore must assume that the Consumer is located in the local time-zone associated with the United States Postal Service postal code associated with the Consumer's address or in the local time-zone associated with the area code associated with the Consumer's telephone number being dialed.  In the event that Encore is in possession of conflicting location information, Encore must assume that it would be inconvenient to contact the Consumer before 8:00 a.m. or after 9:00 p.m., local time in either location.

## VII

## Compliance Plan

**IT IS FURTHER ORDERED** that:

136.   Within 60 days from the Effective Date, Encore must submit to the Enforcement Director for review and determination of non-objection a comprehensive compliance plan designed to ensure that Encore's Debt collection practices comply with all applicable Federal Consumer financial laws and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

Page 41 of 63

a.  comprehensive, written policies and procedures designed to prevent
    violations of Federal Consumer protection laws and prevent associated
    risks of harm to Consumers;

b.  comprehensive, written policies and procedures designed to ensure that
    Encore conducts due diligence regarding the accuracy of the information
    it acquires from Creditors or other Debt buyers;

c.  comprehensive, written policies and procedures designed to insure that
    law firms engaged by Encore to collect Debt do not violate any
    Consumer financial protection laws that must include at a minimum:

    i. an analysis to be conducted by Encore, prior to Encore entering into
       a contract with the law firm, of the ability of the law firm to perform
       its obligations in compliance with all applicable Federal Consumer
       financial laws and Encore's related policies and procedures;

    ii. for new and renewed contracts, a written contract between Encore
        and the law firm, which sets forth the responsibilities of each party,
        including:

        1.    the law firm's specific performance responsibilities and
              duty to maintain adequate internal  controls;

        2.    the law firm's duty to provide adequate training on
              compliance with all applicable Federal Consumer financial
              laws and Encore's related policies and procedures;

        3.    the law firm's duty to alert Encore whenever a

Page 42 of 63

Consumer submits an oral or written dispute or asserts a defense to a lawsuit, including but not limited to a dispute concerning the accuracy or validity of the Debt or any assertion that the suit was filed outside of the applicable statute of limitations;

4. Encore's authority to conduct periodic onsite reviews of the law firm's controls, performance, and information systems related to Debt collection;

5. Encore's right to terminate the contract if the law firm materially fails to comply with the terms specified in the contract, including the terms required by this Paragraph; and

6. periodic review by Encore of the law firm's controls, performance, and information systems related to Debt collections.

d. an effective training program that includes regular, specific, comprehensive training in Consumer protection laws commensurate with individual job functions and duties for appropriate employees, including all employees having responsibilities that relate to Consumer protection laws, senior management and members of the Board;

e. an enhanced and well-documented internal CMS monitoring process incorporated into the daily work of Encore's employees that is designed

Page 43 of 63

to detect and promptly correct compliance weaknesses of Encore and its service providers, particularly weaknesses that impact Consumers;

f.  an effective Consumer complaint monitoring process, including the maintenance of adequate records of all written, oral, or electronic complaints or inquiries, formal or informal, received by Encore and its service providers and the resolution of the complaints and inquiries; and

g.  effective independent audit coverage of the Compliance Program and Encore's compliance with all Consumer protection laws and internal policies and procedures

137.  The Enforcement Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Encore to revise it. In the event that the Enforcement Director directs Encore to revise the Compliance Plan, Encore must make the revisions and resubmit the Compliance Plan to the Enforcement Director within 30 days.

138.  After receiving notification that the Enforcement Director has made a determination of non-objection to the Compliance Plan, Encore must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

139.  Notwithstanding the foregoing, Encore must take whatever steps necessary to fully implement all of the requirements and restrictions described in Paragraphs 129 and 131 within 180 days of the Effective Date and all of the requirements and restrictions described in Paragraphs 132, 133, and 134 within 90 days of the Effective Date.

Page 44 of 63

# VIII

## Role of the Board

**IT IS FURTHER ORDERED** that:

140.    The Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

141.    Although this Consent Order requires Encore to submit certain documents for the review or non-objection by the Enforcement Director, the Board must have the ultimate responsibility for proper and sound management of Encore and for ensuring that Encore complies with Federal Consumer financial law and this Consent Order.

142.    In each instance that this Consent Order requires the Board to ensure adherence to, or undertake to perform certain obligations of Encore, the Board must:

    a.  Authorize whatever actions are necessary for Encore to fully comply with
        the Consent Order;

    b.  Require timely reporting by management to the Board on the status of
        compliance obligations; and

    c.  Require timely and appropriate corrective action to remedy any material
        non-compliance with any failures to comply with Board directives
        related to this Section.

# IX

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

Page 45 of 63

143.    Within 10 days of the Effective Date, Encore must reserve or deposit into a segregated deposit account an amount not less than $34,000,000 or greater than $42,000,000, for the purpose of providing redress to Restitution Eligible Consumers as required by this Consent Order. If the total of payments to Restitution Eligible Consumers is less than $34,000,000, the excess must be deposited into the U.S. Treasury as disgorgement. Except for as provided by Paragraph 147, if the total of payments to Restitution Eligible Consumers would be greater than $42,000,000, the amount that would be paid to each Restitution Eligible Consumer may be reduced pro rata.

144.    For the approximately 12,000 identified Consumers who during the Relevant Time Period paid on a Debt within sixty days of being sent a letter that sought payment of a Time-Barred Debt, and that included the word "settlement," and it was not affirmatively disclosed in that letter that the Consumer would not be sued for non-payment, Encore must provide full restitution ("Time-Barred Debt Restitution"), expected to total approximately $5,300,000, of all payments made, directly or indirectly, during the Relevant Time Period within sixty days of the Consumer being sent a letter that sought payment of a Time-Barred Debt that included the word "settlement" and did not include an affirmative disclosure in that letter that the Consumer would not be sued for non-payment.

145.    For the approximately 35,600 identified Consumers who paid on a Debt after an affidavit with a representation that the Debt could be assumed valid because the Consumer failed to dispute under the FDCPA was submitted in court, Encore must provide restitution ("Dispute Affidavit Restitution"), expected to total approximately

$36,000,000, as follows:

      a.   For the approximately 6,300 identified Consumers who may have been sued by Encore in a lawsuit in which Encore filed an affidavit with a representation that the Debt could be assumed valid because the Consumer failed to dispute under the FDCPA ("Dispute Affidavit Lawsuit") and for which it does not possess documentation evidencing the Consumer's responsibility for the Debt, Encore must provide full restitution, expected to total approximately $12,600,000, of all payments made, directly or indirectly, to Encore during the Relevant Time Period, after Encore filed the Dispute Affidavit.

      b.   For the approximately 29,300 identified Consumers who may have been sued by Encore in a Dispute Affidavit Lawsuit and for which Encore possesses documentation evidencing the Consumer's responsibility for the Debt, Encore must provide full restitution up to $1,000 each, expected to total approximately $23,300,000, of all payments made, directly or indirectly, to Encore during the Relevant Time Period, after Encore filed the Dispute Affidavit.

146.   For the Dispute Affidavit Lawsuit Debt that has yet to be collected, expected to total more than $125,000,000, Encore must within 90 days of the Effective Date:

      a.   Withdraw, dismiss, or terminate all pending Dispute Affidavit Lawsuits;

      b.   Release or move to vacate all judgments obtained during the Relevant Period regarding Dispute Affidavit Lawsuits;

    c.  Cease post-judgment enforcement activities and cease accepting settlement payments related to any Dispute Affidavit Lawsuits; and

    d.  Request that the Consumer reporting agencies amend, delete, or suppress information regarding any Dispute Affidavit Lawsuits, and associated judgments, as applicable.

147.    In addition to the Dispute Affidavit Restitution required by this Section, Encore must, within 180 days of the Effective Date, refund any payments made within the 30 days prior to the Effective Date, and any time after the Effective Date, on Debts associated with any Dispute Affidavit Lawsuit, regardless of whether such refunds would cause Encore to pay more than $42,000,000 in total restitution.

## Redress Plan

148.    Within 60 days of the Effective Date, Encore must prepare and submit to the Enforcement Director for review and non-objection a comprehensive written plan for providing redress consistent with this Consent Order (Redress Plan). The Enforcement Director must have the discretion to make a determination of non-objection to the Redress Plan or direct Encore to revise it. In the event that the Enforcement Director directs Encore to revise the Redress Plan, Encore must make the revisions and resubmit the Redress Plan to the Enforcement Director within 15 days. Upon notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Encore must implement and adhere to the steps, recommendations, deadlines, and timeframes set forth in the Redress Plan.

149.    With respect to Time-Barred Debt Restitution, the Redress Plan must

Page 48 of 63

include: (1) the form of the letter ("Time-Barred Debt Redress Notification Letter") to be sent notifying Restitution Eligible Consumers of the redress; and (2) the form of the envelope that will contain the Time-Barred Debt Redress Notification Letter. The letter must include language explaining the manner in which the amount of redress was calculated; a statement that the provision of refund payment is in accordance with the terms of this Consent Order; and a statement that accepting payment of redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. Encore must not include in any envelope containing a Time-Barred Debt Redress Notification Letter any materials other than the approved letters and redress checks, unless Encore has obtained written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials.

150.    With respect to Dispute Affidavit Restitution, the Redress Plan must include: (1) the process by which Encore will conduct the file review of the approximately 35,600 identified Consumers who may have been sued by Encore in a Dispute Affidavit Lawsuit; (2) the form of the letter ("Dispute Affidavit Restitution Notification Letter") to be sent notifying Restitution Eligible Consumers of the redress; and (3) the form of the envelope that will contain the Dispute Affidavit Restitution Notification Letter. The letter must include language explaining the manner in which the amount of redress was calculated; a statement that the related Dispute Affidavit Lawsuit has been withdrawn, dismissed, vacated, terminated, released, or that the enforcement activities on the Dispute Affidavit Lawsuit have ceased, as applicable; a statement that the redress being provided is in accordance with the terms of this Consent Order; and a statement that

Page 49 of 63

accepting payment of redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. Encore must not include in any envelope containing a Dispute Affidavit Restitution Notification Letter any materials other than the approved letters and redress checks, unless Encore has obtained written confirmation from the Enforcement Director that the Bureau does not object to the inclusion of such additional materials.

151. With respect to Dispute Affidavit Lawsuits and associated judgments that did not result in a Consumer making a payment directly or indirectly to Encore, the Redress Plan must include: (1) the form of the letter ("Lawsuit Dismissal/Judgment Non-enforcement Notification Letter") to be sent notifying eligible Consumers of the withdrawal, dismissal, vacation, termination, release of the Dispute Affidavit Lawsuit or the cessation of enforcement activities on the Dispute Affidavit Lawsuit and associated judgment, as applicable; and (2) the form of the envelope that will contain the Lawsuit Dismissal/Judgment Non-enforcement Notification Letter. The letter must include a statement that the Dispute Affidavit Lawsuit has been withdrawn, dismissed, vacated, terminated, released, or that the enforcement activities on the Dispute Affidavit Lawsuit have ceased, as applicable; a statement that the redress is in accordance with the terms of this Consent Order; and a statement that the redress will not subject the Consumer to any new Debt collection or credit reporting activities for that Debt. Encore must not include in any envelope containing a Lawsuit Dismissal/Judgment Non-enforcement Notification Letter any materials other than the approved letter; unless Encore has obtained written confirmation from the Enforcement Director that the Bureau does not object to the

inclusion of such additional materials.

152.   The Redress Plan must include a description of the following:

    a.   methods used and the time necessary to compile a list of Restitution Eligible Consumers and the approximately 50,000 identified Consumers who will receive a Lawsuit Dismissal/Judgment Non-enforcement Notification Letter;

    b.   methods used to calculate the amount of redress to be paid to each Restitution Eligible Consumer as required herein;

    c.   procedures for issuance and tracking of redress to Restitution Eligible Consumers;

    d.   methods and procedures used and the time necessary to withdraw, dismiss, move to vacate, terminate, or release the Dispute Affidavit Lawsuits and associated judgments, or to cease enforcement activities on Dispute Affidavit Lawsuit judgments;

    e.   procedures for monitoring compliance with the Redress Plan;

    f.   the process for providing restitution for Restitution Eligible Consumers, which must include the following requirements:

        i.   Encore must mail a check to any Restitution Eligible Consumer along with a Redress Notification Letter;

        ii.   Encore must send the check by United States Postal Service first-class mail, address correction service requested, to the Restitution Eligible Consumer's last address as maintained by Encore's records;

      iii. Encore must make reasonable attempts to obtain a current address for any Restitution Eligible Consumer whose Redress Notification Letter and restitution check is returned for any reason, using the National Change of Address System, and must promptly re-mail all returned letters and restitution checks to current addresses. If the check for any Restitution Eligible Consumer is returned to Encore after such second mailing by Encore, or if a current mailing address cannot be identified using National Change of Address System, Encore must retain the restitution amount of such Eligible Consumer for a period of three-hundred sixty (360) days from the date the restitution check was originally mailed, during which period such amount may be claimed by such Restitution Eligible Consumer upon appropriate proof of identity. After such time these monies will be deposited into the U.S. Treasury as disgorgement.

153. The Redress Plan will allow for a reduction in the amount of any payments previously refunded to a Restitution Eligible Customer by Encore prior to the Effective Date.

154. If Encore claims to have made any restitution prior to the Effective Date of this Consent Order that complies with the requirements of this Consent Order, Encore must provide appropriate proof of such restitution to the Enforcement Director.

155. Encore must not condition the payment of any redress to any Restitution Eligible Consumer under this Consent Order on that person's agreement to any condition,

such as the waiver of any right.

### **Assessment of Redress**

156.   Encore must retain at its own expense the services of an independent

certified accounting firm ("Firm"), within 15 days after the Enforcement Director's non-

objection pursuant to Paragraph 150, to determine compliance with the Redress Plan.

The Firm must determine compliance in accordance with the attestation standards

established by the American Institute of Certified Public Accountants for agreed-upon

procedures for engagements.

157.   Prior to engagement, and no later than 60 days from the Effective Date,

Encore must submit the name and qualifications of the Firm, together with the proposed

engagement letter with the Firm and the proposed agreed-upon procedures, to the

Enforcement Director for non-objection. Within 15 days after submission of the Firm's

name, the Enforcement Director must notify Encore in writing of the CFPB's objection or

non-objection thereto.

158.   The Firm must prepare a detailed written report of its assessment of

Encore's compliance with the terms of the Redress Plan ("Restitution Report"). The

Restitution Report must include an assessment of the Redress Plan and the methodology

used to determine the population of Restitution Eligible Consumers, the amount of

redress for each Restitution Eligible Consumer, the procedures used to issue and track

redress payments, and the work of any independent consultants that Encore has used to

assist and review its execution of the Redress Plan.

159.   The Firm must submit the Restitution Report to the Enforcement Director

Page 53 of 63

and the Board within 90 days after Encore completes implementation of the Redress Plan.

## X

### Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

160.    Under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking into account the factors set forth in 12 U.S.C. § 5565(c)(3), Encore must pay a civil money penalty of $10,000,000 to the Bureau, as directed by the Bureau and as set forth herein.

161.    Within 10 days of the Effective Date, Encore must pay the civil money penalty in the form of a wire transfer to the Bureau or to such agent as the Bureau may direct, and in accordance with wiring instructions to be provided by counsel for the Bureau.

162.    The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau in accordance with Section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

163.    Encore must treat the civil money penalty as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Encore must not:

      a.   Claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any civil money penalty that Encore pays under this Consent Order; or

   b.  Seek or accept, directly or indirectly, reimbursement or indemnification

       from any source, including but not limited to payment made pursuant to

       any insurance policy, with regard to any civil money penalty that Encore

       pays under this Consent Order.

164.   To preserve the deterrent effect of the civil money penalty, in any Related

Consumer Action, Encore must not argue that Encore is entitled to, nor must Encore

benefit by, any offset or reduction of any monetary remedies imposed in the Related

Consumer Action, because of the civil money penalty paid in this action ("Penalty

Offset"). If the court in any Related Consumer Action grants such a Penalty Offset, Encore

must, within 30 days after entry of a final order granting the Penalty Offset, notify the

Bureau and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment

must not be deemed an additional civil money penalty and must not be deemed to change

the amount of the civil money penalty imposed in this action.

## XI

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

165.   In the event of any default on Encore's obligations to make payment under

this Consent Order, interest, computed pursuant to 28 U.S.C. § 1961, as amended, must

accrue on any outstanding amounts not paid from the date of default to the date of

payment, and must immediately become due and payable.

166.   Encore must relinquish all dominion, control, and all legal and equitable

right, title, and interest to the funds paid to the fullest extent permitted by law and no

part of the funds must be returned to Encore.

167.    In accordance with 31 U.S.C. § 7701, Encore, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

168.    Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Encore must notify the Enforcement Director of the final judgment, consent order, or settlement in writing.  That notification must indicate the amount of redress, if any, that Encore  paid or is required to pay to Consumers and should describe the Consumers or classes of Consumers to whom that redress has been or will be paid.

## XII

### Reporting Requirements

**IT IS FURTHER ORDERED** that:

169.    Encore must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to, a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; any claims made under, or in connection with a default or remedial provision of a loan or lending agreement under Paragraph 130(iv); the filing of any bankruptcy or insolvency proceeding by or against Encore; or a change in Encore's name or address.

170.   Encore must report any change in the information required to be submitted under Paragraph 169 at least 30 days prior to such change. Provided, however, that with respect to any proposed change about which Encore learns less than 30 days prior to the date such action is to take place, Encore must notify the Bureau as soon as is practicable after obtaining such knowledge.

171.   Within 180 days of the Effective Date, and again one year after the Effective Date,  Encore must submit to the Enforcement Director an accurate written compliance progress report (Compliance Report), which has been approved by the Board, which, at a minimum:

a.   Describes in detail the manner and form in which Encore has complied with this Consent Order; and

b.   Attaches a copy of each Consent Order acknowledgment obtained under Section XIII of this Consent Order, unless previously submitted to the Bureau.

## XIII

## Order Distribution and Acknowledgement

**IT IS FURTHER ORDERED** that:

172.   Within 30 days of the Effective Date, Encore must deliver a copy of this Consent Order to each of its board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

173.   For five years from the Effective Date, Encore must deliver a copy of this

Consent Order to any business entity resulting from any change in structure as set forth in Section XII, any future board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

174.    Encore must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, with any electronic signatures complying with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

### XIV

### Reporting Requirements

**IT IS FURTHER ORDERED** that:

175.    Encore must create, for at least 5 years from the Effective Date, the following business records:

   a.  All documents and records necessary to demonstrate full compliance with each provision of this Consent Order, including all submissions to the Bureau;

   b.  All documents and records pertaining to the Redress Program, as set forth in Section IX; and

   c.  Copies of all templates used to collect Debt, including but not limited to dunning letters and affidavits.

176.    Encore must retain the documents identified in Paragraph 175 for at least 5

Page 58 of 63

years.

177.    Encore must make the documents identified in Paragraph 175 available to the Bureau upon the Bureau's request.

## XV

## Notices

178.    Unless otherwise directed in writing by the Bureau, Encore must provide all submissions, requests, communications, consents, or other documents relating to this Consent Order, in writing with the subject line, "*In Re Encore,* File No. 2015-CFPB-___.," and send them either:

     a.  By overnight courier (not the U.S. Postal Service), as follows:

     Assistant Director for Enforcement
     Consumer Financial Protection Bureau
     1625 I Street, NW
     Washington, DC 20006; or

     b.  By first class mail to the below address and contemporaneously sent by email to Enforcement_Compliance@CFPB.gov:

     Assistant Director for Enforcement
     Consumer Financial Protection Bureau
     1700 G Street, NW
     Washington, DC 20552

## XVI

## Compliance Monitoring

**IT IS FURTHER ORDERED** that, to monitor Encore's compliance with this Consent Order:

179.    Within 14 days of receipt of a written request from the Bureau, Encore must submit additional compliance reports or other requested information, which must be

made under penalty of perjury; provide sworn testimony; or produce documents.

180.    For purposes of this Section, the Bureau may communicate directly with Encore, unless Encore asks the Bureau in writing to communicate through retained counsel.

181.    Encore must permit Bureau representatives to interview any employee or other person affiliated with Encore who has agreed to such an interview. The person interviewed may have counsel present.

182.    Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII

### Modifications and Extensions of Time

183.    Encore may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Enforcement Director.

184.    The Enforcement Director may, in his or her discretion, modify any non-material provisions of this Consent Order (e.g., reasonable extensions of time and changes to reporting requirements), if he or she determines good cause justifies the modification. Any such modification by the Enforcement Director must be in writing.

185.    Upon a written showing of good cause, the Enforcement Director may modify any provision of this Consent Order to the extent that compliance with that provision could cause Encore, its Board, officers, or employees to violate any law, rule, or regulation, including but not limited to any subsequent amendments of the CFPA, FCRA,

or FDCPA.

186.    In the event that Encore acquires an entity, a line of business from an entity, or an ownership stake in an entity (an "Acquired Entity") in the business of the purchase, transfer, or collection of Debts in the United States, the Acquired Entity will have a transition period of 90 days to comply with the requirements of this Consent Order.  Any asset purchase in which Encore acquires and continues to use the operational or servicing systems of a legacy entity not previously owned by Encore will be treated as an Acquired Entity for the purpose of this provision. Any Debt that Encore acquires as a result of its acquisition of an Acquired Entity or an ownership stake in an Acquired Entity will be considered purchased on the date the Acquired Entity purchased the Debt.

## XVIII

## Administrative Provisions

**IT IS FURTHER ORDERED** that:

187.    The provisions of this Consent Order will not bar, estop, or otherwise prevent the Bureau or any other governmental agency from taking any other action against Encore.

188.    The Bureau releases and discharges Encore from all potential liability for violations of law that the Bureau has or might have been asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices alleged in the Consent Order in future enforcement actions against Encore and its affiliates, including, without limitation, to establish a pattern or practice of

violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the terms and provisions of the Consent Order, or to seek penalties for any violation thereof.

189.    This Consent Order does not form, and may not be construed to form, a contract binding the Bureau or the United States.

190.    This Consent Order will terminate 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Encore. If such action is dismissed or the relevant adjudicative body rules that Encore did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

191.    Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

192.    Should Encore seek to transfer or assign all or part of its operations or assets that are subject to this Consent Order, Encore must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

193.    The provisions of this Consent Order will be enforceable by the Bureau. For

any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondents wherever Respondents may be found and Respondents may not contest that court's personal jurisdiction over Respondents.

194.    This Consent Order and the accompanying Stipulation contain the complete agreement between the parties.  The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

195.    Nothing in this Consent Order may be construed as allowing Encore, its Board, officers, or employees to violate any law, rule, or regulation.


SO ORDERED this 3ʳᵈ day of _September_ , 2015.


Richard Cordray
Director
Consumer Financial Protection Bureau


Page 63 of 63

# EXHIBIT B

# UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) Case Number: 8:12-CV-00182-T-27EAJ |
| | ) |
| v. | ) |
| | ) |
| | ) |
| ASSET ACCEPTANCE, LLC, | ) |
| a Delaware limited liability company, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## CONSENT DECREE

**WHEREAS,** Plaintiff, the United States of America, has commenced this action by filing the Complaint herein; Defendant, Asset Acceptance, LLC, has waived service of the Summons and Complaint; the parties have been represented by the attorneys whose names appear hereafter; and the parties have agreed to settlement of this action upon the following terms and conditions, without adjudication of any issue of fact or law, to settle and resolve all matters in dispute arising from the Complaint to the date of entry of the Decree and without Defendant admitting any of the matters alleged in the Complaint other than jurisdictional facts;

**THEREFORE,** on the joint motion of the Plaintiff and Defendant, it is hereby **ORDERED, ADJUDGED** and **DECREED** as follows:

Consent Decree, Page 1 of 28

## FINDINGS

1.      This Court has jurisdiction of the subject matter and of the parties.

2.      The Complaint states a claim upon which relief may be granted against the Defendant under Sections 5(a), 5(m)(1)(A), 13(b), and 16(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), and 56(a); the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681u; and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692-1692p.

3.      Venue in this district is proper under 28 U.S.C. §§ 1391(b-c) and 1395(a) and 15 U.S.C. § 53(b).

4.      The activities of the Defendant are in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

5.      For purposes of this Consent Decree ("Decree"), the definitions set forth in the FCRA, 15 U.S.C. § 1681a, and the FDCPA, 15 U.S.C. § 1692a, shall apply.

6.      Defendant has entered into this Decree freely and without coercion. Defendant further acknowledges that it has read the provisions of this Decree and is prepared to abide by them.

7.      Plaintiff and Defendant, by and through their counsel, have agreed that the entry of this Decree resolves all matters of dispute between them arising from the Complaint in this action, up to the date of entry of this Decree.

8.      Defendant has not admitted any of the allegations of wrongdoing set forth in the Complaint, and entry of this Decree is not an admission of any such allegations of wrongdoing or

Exhibit B
Page 70

violation of law. Nonetheless, Defendant stipulates and agrees to entry of this Decree in order to settle and resolve these disputes.

9.      All parties waive all rights to seek appellate review or otherwise challenge or contest the validity of this Decree. Defendant further waives and releases any claim it may have against the Federal Trade Commission, its employees, representatives, or agents.

10.     Defendant agrees that this Decree does not entitle it to seek or obtain attorneys' fees as a prevailing party under the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended by Pub. L. 104-121, 100 Stat. 847, 863-64 (1996), and further waives any right to attorneys' fees that may arise under said provision of law.

11.     This action and the relief awarded herein are in addition to, and not in lieu of, other remedies as may be provided by law, including both civil and criminal remedies.

12.     Entry of this Decree is in the public interest.

## DEFINITIONS

For purposes of this Decree, the following definitions shall apply:

1.      **"Commission"** or **"FTC"** means the Federal Trade Commission.

2.      **"Defendant"** means Asset Acceptance, LLC, and its successors and assigns.

3.      **"Plaintiff"** means the United States of America.

4.      **"Clearly and prominently"** means:

a.      that information presented in writing shall be in a type size and location sufficient for an ordinary consumer to read and comprehend it, and shall be disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary

Consent Decree, Page 3 of 28

Exhibit B
Page 71

consumer. If the information is contained in a multi-page print document, the disclosure shall appear on the first page; and

b.      that information presented orally shall be disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

5.      **"Debt collection"** means any activity the principal purpose of which is to collect, or attempt to collect, directly or indirectly, debts owed, or asserted to be owed, or due.

6.      **"Debt"** means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

# ORDER

## I.      CIVIL PENALTY

**IT IS ORDERED** that:

A.      For a civil penalty for violations of the FCRA and the FDCPA, Defendant shall pay to the Plaintiff, pursuant to Section 621(a) of the FCRA, 15 U.S.C. § 1681s(a), and Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), the amount of two million five hundred thousand dollars ($2,500,000).

B.      Defendant shall make the payment required by Part A on or before the tenth day following entry of this Decree. Such payment shall be made by electronic fund transfer in accordance with procedures specified by the Office of Consumer Protection Litigation, Civil

Division, United States Department of Justice, Washington, D.C. 20530.

C.   In the event of any default in payment, which default continues for ten (10) days beyond the due date of payment, the entire unpaid amount, together with interest, as computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of payment, shall immediately become due and payable.

D.   The judgment amount set forth in Part A represents a civil penalty owed to the United States Government, is not compensation for actual pecuniary loss, and, therefore, is not subject to discharge under the Bankruptcy Code pursuant to 11 U.S.C. § 523(a)(7).

E.   Proceedings initiated under this Part are in addition to, and not in lieu of, any other civil or criminal penalties that may be provided by law, including any other proceedings the Plaintiff may initiate to enforce this Decree.

## II.   INJUNCTION AGAINST VIOLATIONS OF THE FTC ACT

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees, and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from taking the following actions:

A.   Making any material misrepresentation, expressly or by implication, to collect or to attempt to collect a debt or to obtain information concerning a consumer; and

B.   Making any material representation, expressly or by implication, that a consumer

Consent Decree, Page 5 of 28

owes a debt or as to the amount of a debt, unless, at the time of making the representation, Defendant has a reasonable basis for making such representation.

*Provided that*, in those instances in which Defendant (a) is required by Part III.A or B of this Decree to conduct an investigation, (b) has done so, and (c) has reasonably concluded that the information on which Defendant relies to collect or attempt to collect the debt is accurate and complete, the conclusions of the investigation shall constitute a reasonable basis.

*Provided further* that, in making representations concerning a debt, Defendant can reasonably rely on information from the original creditors of the debts to substantiate the accuracy and completeness of the debts in the absence of a reasonable indication that such information is incomplete, inaccurate, unreliable, or does not substantiate the claim. A "reasonable indication" shall take into account the reliability and source of the information, but shall not require any of the Part III investigational procedures outlined below, other than taking into account the reliability and source of the information.

## III. DUTY TO CONDUCT A REASONABLE INVESTIGATION

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees, and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from failing to take the following actions:

    A.    In each instance in which a consumer, at any time, questions, disputes, or

challenges the accuracy or completeness of the information on which Defendant is relying to make any representation that the consumer owes a debt or as to the amount of a debt; or a person acting reasonably would consider the information on which Defendant is relying to make any representation regarding either the existence or the amount of a debt to be facially unreliable, materially inaccurate, or missing material information; Defendant shall either

    1.    Close the account, permanently terminate collection efforts with respect to the specific debt, and request deletion of that item of information from the consumer's credit reporting file, or

    2.    Report that item of information as disputed to any consumer reporting agency to which the information was previously reported and conduct and complete a reasonable investigation into the accuracy or completeness of such information. If such disputes are raised during a telephone call with the consumer, Defendant may reasonably provide responsive information or pose reasonable questions to the consumer, in a manner that complies with applicable law, in an effort to resolve any such disputes raised by the consumer. If Defendant does not substantiate that the consumer owes the debt following a reasonable investigation, Defendant shall close the account, permanently terminate collection efforts with respect to the specific debt, and request deletion of that item of information from the consumer's credit reporting file. If Defendant does not complete its reasonable investigation within thirty (30) days from receipt of the dispute, Defendant shall request deletion of that item from the consumer's

credit reporting file and cease collection activities until the reasonable investigation is complete.

*Provided that*, if as a result of its decision to permanently terminate collection efforts or if following a reasonable investigation, Defendant does not substantiate that the consumer owes the debt, Defendant shall not sell the debt or provide it to any other corporate entity other than the entity from which it acquired the debt.

*Provided further* that nothing in Parts II and III shall require Defendant to conduct an investigation into the accuracy or completeness of the information on which Defendant is relying if Defendant determines that the consumer's question, dispute, or challenge is frivolous or irrelevant or, to the extent no new material evidence or information has been provided, has already been the subject of a reasonable investigation. Notwithstanding any other provision in this Decree, the Decree shall not restrict or prohibit Defendant from complying with any federal or state law requirements, so long as such state law requirements are not inconsistent with federal law.

*Provided further* that if a consumer initiates contact with Defendant by any means, Defendant may respond to the consumer prior to the completion of the investigation.

B.    In each instance where a person acting reasonably would consider the information in a specific portfolio of accounts, on which Defendant is relying to make any representation to a consumer, to be facially unreliable, materially inaccurate, or missing material information, Defendant shall terminate collection efforts on each account in the portfolio until it conducts a reasonable investigation into the accuracy or completeness of the information relating to that

Consent Decree, Page 8 of 28

account. The factors that Defendant must consider in evaluating the material accuracy or completeness of the information on which Defendant relies include, but are not limited to, whether 1) other accounts in a particular portfolio have been disputed by consumers for similar reasons at disproportionately high rates; 2) documents from the original creditor (excluding affidavits) are not available; 3) because of age, missing data, or other characteristics, a disproportionately high number of accounts in a particular portfolio have been supplemented by data from third-party sources; or 4) any other information learned about a particular portfolio's credit originator and its methods of doing business calls into question the accuracy or completeness of the information.

*Provided that*, if, following a reasonable investigation, Defendant cannot reasonably verify the accuracy or completeness of the account data in a particular portfolio, Defendant may not sell, or provide to any other corporate entity, the portfolio or individual accounts within the portfolio other than the entity from which it acquired the debt.

C.  For purposes of this Decree, a "reasonable investigation" shall mean an investigation in which Defendant objectively evaluates and weighs the relevant information and circumstances, which may include, among other things:

  1.  the reliability of the information on which Defendant relies in collecting or attempting to collect the debt, including the credibility of the source of that information;

  2.  the accuracy and completeness of any information from the credit originator, taking into account the reliability and source of the information;

Consent Decree, Page 9 of 28

3.    the accuracy and completeness of any information Defendant has obtained or may obtain from third party sources, including data aggregators, brokers or consumer reporting agencies;

4.    the strength and credibility of any information provided by the consumer questioning, disputing, or challenging the accuracy or completeness of such information or otherwise obtained by Defendant and the responsiveness of the consumer to reasonable requests for information;

5.    the nature and frequency of disputes received by Defendant about accounts within the same portfolio;

6.    with respect to information obtained from the consumer, the methods used by Defendant to collect the information, which shall be in compliance with applicable laws; and

7.    any other reliable information that confirms, contradicts, or calls into question the accuracy or completeness of such information.

D.    Subsections A, B, and C of this Part do not affect the Defendant's obligations to comply with all applicable provisions of the FDCPA or FCRA. A "dispute" under this Part III does not necessarily constitute a "dispute" for FDCPA or FCRA purposes.

## IV.    REQUIRED DISCLOSURES

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees, and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or

through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from failing to take the following actions:

A.      At the time of Defendant's initial communication with a consumer in connection with the collection of a debt, for any debt that the Defendant knows or should know may be beyond the applicable statute of limitations, Defendant shall make the disclosure(s) set forth in Part IV.D, below, in its validation notice or other written communication containing the information required by Section 809 of the FDCPA, 15 U.S.C. § 1692g.

B.      Subsequent to its initial communication with a consumer, for any debt where Defendant comes into possession of information from which the Defendant knows or should know that the debt has passed the applicable statute of limitations, Defendant shall, in its next communication with the consumer, whether oral or written, make the disclosure(s) set forth in Part IV.D, below.

*Provided that* Defendant may satisfy this provision by making the disclosure(s) set forth in Part IV.D, below, on or before the date that the debt has passed the applicable statute of limitations.

C.      In addition to making the applicable disclosure(s) required by Part IV.A or IV.B, above, in any subsequent communication in connection with collecting a debt, Defendant shall make the disclosure(s) set forth in Part IV.D, below, if failure to do so would be likely to mislead a consumer acting reasonably under the circumstances about the Defendant's ability or intent to take legal action to collect the debt and the consumer's rights in connection with such legal

Consent Decree, Page 11 of 28

action.  Factors to consider when assessing whether the net impression of the communication is likely misleading to a consumer acting reasonably under the circumstances include, but are not limited to: 1) the amount of time that has lapsed since Defendant last communicated with the consumer; 2) the form of the Defendant's communication with the consumer; 3) the content of Defendant's communication with the consumer; 4) the context of Defendant's communication with the consumer; and 5) any information learned from the consumer.

   *Provided that,* for purpose of this provision, if one-hundred eighty (180) days or more has elapsed since Defendant previously communicated with the consumer in connection with collecting a debt, then there shall exist a rebuttable presumption that failure to make the disclosure(s) would be likely to mislead a consumer acting reasonably under the circumstances about the Defendant's ability or intent to take legal action to collect the debt and the consumer's rights in connection with such legal action.

   *Provided further that*, after one (1) year has lapsed after the date of entry of this Order, any competent and reliable evidence (including appropriate and adequate reports, studies, surveys, or other extrinsic evidence) relating to whether failure to make a subsequent disclosure(s) required under Part IV.C. of this Order is likely to mislead a consumer acting reasonably under the circumstances about the Defendant's ability or intent to take legal action to collect the debt and the consumer's rights in connection with such legal action shall constitute a change in circumstances, providing a party good cause to file a motion under Fed. R. Civ. P. 60(b) to modify or amend the terms of Part IV.C.

   D.      As required by Parts IV.A, B, and C, above, Defendant shall make the following

Consent Decree, Page 12 of 28

disclosure(s), clearly and prominently, as applicable:

    1.    When collecting on debt where the debt is not past the date for obsolescence provided for in Section 605(a) of the Fair Credit Reporting Act, 15 U.S.C. § 1681c:

        •    The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it. If you do not pay the debt, we [Asset Acceptance, LLC], may [continue to] report it to the credit reporting agencies [as unpaid].

    2.    When collecting on debt where the debt is passed the date for obsolescence provided for in Section 605(a) of the Fair Credit Reporting Act, 15 U.S.C. § 1681c:

        •    The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it, and we will not report it to any credit reporting agency.

    E.    Defendant shall not make any representation or statement, or take any other action that interferes with, detracts from, contradicts, or otherwise undermines the disclosures required in Part IV.D, above.

    F.    Defendant shall be deemed to have complied with the disclosure requirements of Part IV A, B, and C if Defendant makes a disclosure to consumers in a specific state, county, or city that 1) is required by the laws or regulations of that jurisdiction, 2) complies with those laws or regulations, and 3) is substantially similar to the disclosure(s) required in Part IV.D, above.

G.      For any debt where the Defendant has provided the applicable disclosure(s) required by Parts IV.A, B, or C to the consumer,

1.      Defendant shall not initiate any arbitration or legal action to recover on such debt;

2.      In selling, transferring, or assigning such a debt, the Defendant shall not sell, transfer, or assign with the debt any right to commence any arbitration or legal action to recover on the debt.

3.      The Defendant shall include in all contracts to sell, transfer, or assign such debt a provision that contains a clear and prominent notification to the buyer, transferee, or assignee that:

a.      Defendant is not selling, transferring, or assigning all of its rights to collect the debt; and

b.      Defendant is expressly withholding from the sale, transfer, or assignment any rights it may have to initiate any arbitration or legal action to recover on the debt.

4.      The Defendant shall provide a copy of this Order to any person to whom Defendant sells, transfers, or assigns any such debt.

H.      Nothing in this Part shall be construed to supersede or be in lieu of any other applicable requirements, including but not limited to Section 809 of the FDCPA, or any state or local statutes.

I.      Defendant shall be responsible for the requirements in Section IV forty-five (45)

Consent Decree, Page 14 of 28

days after entry of this Decree.

## V. FURNISHING NEGATIVE INFORMATION TO CONSUMER REPORTING AGENCIES

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees, and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from failing to provide, to any consumer about whom Defendant reports negative information to any consumer reporting agency, a written notice no later than thirty (30) days after furnishing such negative information. For purposes of this Part, Defendant shall no longer be deemed to have provided written notice if the notice is returned to Defendant as undeliverable.

## VI. INJUNCTION AGAINST FCRA VIOLATIONS

**IT IS FURTHER ORDERED** that Defendant, and its officers, agents, servants, employees and all persons or entities in active concert or participation with any of them, who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, are hereby permanently restrained and enjoined from taking the following actions:

    A.    Furnishing information relating to any consumer to any consumer reporting agency in violation of Section 623(a)(1) of the FCRA, 15 U.S.C. § 1681s-2(a)(1).

    B.    Failing to investigate consumer disputes, as required by Section 623(b) of the

FCRA, 15 U.S.C. § 1681s-2(b), when consumer reporting agencies refer disputes to it pursuant to Section 611(a)(2), 15 U.S.C. § 1681i(a)(2).

      C.      Failing to investigate consumer disputes received directly from consumers, as required by the Furnisher Rule, 16 C.F.R. Part 660.

      D.      Failing to comply in any other respect with the FCRA.

**VII.    INJUNCTION AGAINST FDCPA VIOLATIONS**

      **IT IS FURTHER ORDERED** that Defendant, and each of its officers, agents, servants, employees and all persons or entities in active concert or participation with any of them who receive actual notice of this Decree by personal service or otherwise, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, or other device, in connection with collecting or attempting to collect debts, are hereby permanently restrained and enjoined from taking the following actions:

      A.      Communicating more than once with persons other than the consumer for the purpose of obtaining location information about the consumer without the person's consent or a reasonable belief that the earlier response of the person was erroneous or incomplete and that the person now has correct or complete location information, in violation of Section 804(3) of the FDCPA, 15 U.S.C. § 1692b(3);

      B.      Except as provided in Section 804 of the FDCPA, 15 U.S.C. § 1692b(3), without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a postjudgment judicial remedy, communicating in connection with the collection of any debt with any person

Consent Decree, Page 16 of 28

other than the consumer, his or her attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector, in violation of Section 805(b) of the FDCPA, 15 U.S.C. § 1692c(b). For the purpose of this Part VII, the term "consumer" includes the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator;

     C.    Using any false, deceptive, or misleading representation or means in connection with the collection of any debt, in violation of Section 807 of the FDCPA, 15 U.S.C. § 1692e, including, but not limited to, the following:

          1.    Using a false representation concerning the character, amount, or legal status of any debt, in violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A); or

          2.    Communicating credit information to consumer reporting agencies that Defendant knows, or should know, to be false, in violation of Section 807(8) of the FDCPA, 15 U.S.C. § 1692e(8);

     D.    Continuing to collect on any debt without obtaining and providing to the consumer verification of the debt when the consumer has notified Defendant in writing within the thirty (30) day period described in Section 809(a) of the FDCPA, 15 U.S.C. §1692g(a), that the debt, or any portion thereof, is disputed, as prohibited by Section 809(b) of the FDCPA, 15 U.S.C. §1692g(b); and

     E.    Failing to comply in any other respect with the FDCPA, as attached and as hereafter amended.

Consent Decree, Page 17 of 28

## VIII. NOTICE REQUIREMENTS

**IT IS FURTHER ORDERED** that:

A.  For a period of five (5) years from the date of entry of this Decree, Defendant, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, agent, servant, officer, employee, or other device, in connection with acting as a "debt collector" in the collection of a "debt" from a "consumer," as those terms are defined in Section 803(6), (5), and (3), respectively, of the FDCPA, 15 U.S.C. § 1692a(6), (5), and (3), shall make the following disclosure clearly and prominently on each written collection communication that is sent to a consumer for the purpose of collecting a debt:

> Federal law prohibits certain methods of debt collection, and requires that we treat you fairly. You can stop us from contacting you by writing a letter to us that tells us to stop the contact or that you refuse to pay the debt. Sending such a letter does not make the debt go away if you owe it. Once we receive your letter, we may not contact you again, except to let you know that there won't be any more contact or that we intend to take a specific action.

> If you have a complaint about the way we are collecting this debt, please write to us at [current physical address], email us at [current email address], or call us toll-free at [current phone number] between 9:00 A.M. and 5:00 P.M. Eastern Standard Time, Monday - Friday.

> The Federal Trade Commission enforces the Fair Debt Collection Practices Act (FDCPA). If you have a complaint about the way we are collecting your debt, please contact the FTC online at www.ftc.gov; by phone at 1-877-FTC-HELP; or by mail at 600 Pennsylvania Ave., N.W., Washington, D.C. 20580.

The above disclosure shall be given in the language(s) that appears in such communications sent

Consent Decree, Page 18 of 28

to consumers. Defendant shall be responsible for the requirements in Part VIII.A forty-five (45) days after entry of this Decree.

     B.    Defendant, whether acting directly or through any business entity, corporation, subsidiary, division, affiliate, agent, servant, officer, employee, or other device, in connection with acting as a "debt collector" in the collection of a "debt" from a "consumer," as those terms are defined in Section 803(6), (5), and (3), respectively, of the FDCPA, 15 U.S.C. § 1692a(6), (5), and (3), shall provide a copy of the following notice to all officers, servants, agents, and employees having responsibility with respect to the collection of consumer debts, within thirty (30) days of the date of entry of this Decree, and to each officer, servant, agent, and employee hired for a period of five (5) years after that date, no later than the time the officer, servant, agent, and employee assumes responsibility with respect to the collection of such debts, and shall secure from each such person, within thirty (30) days of delivery, a signed and dated statement acknowledging receipt of a copy of the notice:

> Debt collectors must comply with the federal Fair Debt Collection Practices Act, which limits our activities in trying to collect money from consumers.
>
> In particular, Section 804 of the Act says that you may not contact any person other than the consumer for the purpose of acquiring location information about the consumer more than once unless you have reason to believe that the earlier response of the person was incomplete and that such person now has corrected or complete location information.
>
> Also, Section 805 of the Act says that you may not contact a consumer at work if you know or should know it is inconvenient for the consumer, and that you may not communicate with any person other than the consumer in connection with the collection of

Consent Decree, Page 19 of 28

a debt, for any purpose other than to obtain location information about the consumer.

In addition, Section 806 of that Act states that you may not engage in any conduct the natural consequences of which is to harass, oppress or abuse any person in connection with the collection of a debt, including, but not limited to, using language the natural consequence of which is to abuse the hearer or reader.

Furthermore, Section 807 of that Act prohibits the use of any false, deceptive or misleading representation or means in connection with the collection of any debt, including, but not limited to, communicating or threatening to communicate to a consumer reporting agency information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

**Individual debt collectors may be financially liable for their violations of the Act.**

*Provided that* for purposes of compliance with Part VIII.B of this Decree, the signature required may be in the form of an electronic signature.

## IX. DISTRIBUTION OF CONSENT DECREE, NOTICE TO FURNISHERS OF INFORMATION: OBLIGATIONS OF FURNISHERS UNDER THE FCRA, AND THE FDCPA BY DEFENDANT

**IT IS FURTHER ORDERED** that:

For a period of three (3) years from the date of entry of this Decree, Defendant shall deliver copies of the Decree, the FDCPA, and the FCRA as directed below:

A.      Defendant shall provide copies of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16 C.F.R. Part 698, Appendix G, and the FDCPA to all of its principals, officers, directors, and managers.  Defendant must also deliver copies of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the

Consent Decree, Page 20 of 28

FCRA, 16 C.F.R. Part 698, Appendix G, and the FDCPA to all of its employees, agents and representatives who engage in conduct related to the subject matter of this Decree. For current personnel, delivery shall be within five (5) days of service of this Decree upon Defendant. For new personnel, delivery shall occur prior to their assuming their responsibilities. For any business entity resulting from any change in structure set forth in Subsection A.2 of the Part titled "Compliance Reporting," delivery shall be at least ten (10) days prior to the change in structure.

B. Defendant must secure a signed and dated statement acknowledging receipt of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16 C.F.R. Part 698, Appendix G, and the FDCPA, within thirty (30) days of delivery, from all persons receiving copies of such documents, pursuant to this Part.

*Provided that* for purposes of compliance with Part. IX.B of this Decree, the signature required may be in the form of an electronic signature.

## X. COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring and investigating compliance with any provision of this Decree:

A. Within thirty (30) days of receipt of written notice from a representative of the Commission, Defendant shall submit additional written reports, which are true and accurate and sworn to under penalty of perjury; produce documents for inspection and copying; appear for deposition; and provide entry during normal business hours to any business location in Defendant's possession or direct or indirect control to inspect the business operation;

B. In addition, the Commission is authorized to use all other lawful means, including

Consent Decree, Page 21 of 28

but not limited to:

        1.      Obtaining discovery from any person, without further leave of court, using the procedures prescribed by Fed. R. Civ. P. 30, 31, 33, 34, 36, 45, and 69; and

        2.      Having its representatives pose as consumers and suppliers to Defendant, their employees, or any other entity managed or controlled in whole or in part by Defendant, without the necessity of identification or prior notice; and

    C.     Defendant shall permit representatives of the Commission to interview any employer, consultant, independent contractor, representative, agent, or employee who has agreed to such an interview, relating in any way to any conduct subject to this Decree. The person interviewed may have counsel present.

    *Provided, however*, that nothing in this Decree shall limit the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1, to obtain any documentary material, tangible things, testimony, or information relevant to unfair or deceptive acts or practices in or affecting commerce (within the meaning of 15 U.S.C. § 45(a)(1)).

## XI.   COMPLIANCE REPORTING BY DEFENDANT

    **IT IS FURTHER ORDERED** that, in order that compliance with the provisions of this Decree may be monitored:

    A.     For a period of four (4) years from the date of entry of this Decree, Defendant shall notify the Commission of any changes in its structure or the structure of any business entity that Defendant directly or indirectly controls, or has an ownership interest in, that may affect

Consent Decree, Page 22 of 28

Exhibit B
Page 90

compliance obligations arising under this Decree, including but not limited to: incorporation or other organization; a dissolution, assignment, sale, merger, or other action; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Decree; or a change in the business name or address, at least thirty (30) days prior to such change.

*Provided that*, with respect to any such change in the business entity about which Defendant learns less than thirty (30) days prior to the date such action is to take place, Defendant shall notify the Commission as soon as is practicable after obtaining such knowledge.

B.　One hundred eighty (180) days after the date of entry of this Decree and annually thereafter for a period of four (4) years, Defendant shall provide a written report to the FTC, which is true and accurate and sworn to under penalty of perjury, setting forth in detail the manner and form in which they have complied and are complying with this Decree. This report shall include, but not be limited to:

　　1.　A copy of each acknowledgment of receipt of employee notice obtained pursuant to Part VIII.B of this Decree:

　　2.　A copy of each acknowledgment of receipt of this Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16 C.F.R. Part 698, Appendix G, and FDCPA obtained pursuant to Section IX.B of this Decree; and

　　3.　Any other changes required to be reported pursuant to subsection A of this Part.

Consent Decree, Page 23 of 28

    C.    Defendant shall notify the Commission of the filing of a bankruptcy petition by Defendant within fifteen (15) days of filing.

    D.    For purposes of this Decree, Defendant shall, unless otherwise directed by the Commission's authorized representatives, send by overnight courier all reports and notifications required by this Decree to the Commission, to the following address:

ASSOCIATE DIRECTOR FOR ENFORCEMENT
BUREAU OF CONSUMER PROTECTION
FEDERAL TRADE COMMISSION
600 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20580

RE: *United States v. Asset Acceptance, L.L.C.*, Civil Action No.

***Provided that***, in lieu of overnight courier, Defendant may send such reports or notifications by first-class mail, but only if Defendant contemporaneously sends an electronic version of such report or notification to the Commission at: DEBrief@ftc.gov.

    E.    For purposes of the compliance reporting and monitoring required by this Decree, the Commission is authorized to communicate directly with Defendant.

## XII.   RECORD KEEPING PROVISIONS

**IT IS FURTHER ORDERED** that, for a period of seven (7) years from the date of entry of this Decree, Defendant, for any of its businesses for which the primary activity is the collection of debts, is hereby restrained and enjoined from failing to create and retain the following records:

    A.    Accounting records that reflect the revenues generated in connection with the collection of debts, and the disbursement of such revenues;

Consent Decree, Page 24 of 28

B.    Personnel records accurately reflecting: the name, address, and telephone number of each person employed in any capacity by such business, including as an independent contractor; that person's job title or position; the date upon which the person commenced work; and the date and reason for that person's termination, if applicable;

C.    Consumer files containing the names, addresses, phone numbers, dollar amounts of debt owed, records of collection activity, and amounts collected;

D.    For every consumer complaint, whether received directly, indirectly, or through a third party, records that include:

1.    Any complaint and the date received, and the nature of the complaint as reflected in any notes, logs, or memoranda, including a description of the conduct alleged; and

2.    The basis of the complaint, including the names of any debt collectors or supervisors complained about; the nature of any investigation conducted concerning the validity of any complaint; all documents relating to the disposition of the complaint, including records of all contacts with the consumer, Defendant's response to the complaint and the response date, whether the complaint was resolved, the date of resolution; and any action taken to correct the conduct complained about;

E.    Copies of all scripts, training materials, form letters and emails, or other materials used in connection with communicating to consumers;

F.    Copies of all advertisements and other marketing materials; and

Consent Decree, Page 25 of 28

G.     All records and documents necessary to demonstrate full compliance with each
provision of this Decree, including, but not limited to, copies of acknowledgments of receipt of
notices given to employees, required by Part VIII.B, copies of acknowledgments of receipt of this
Decree, Notice to Furnishers of Information: Obligations of Furnishers Under the FCRA, 16
C.F.R. Part 698, Appendix G, and the FDCPA, required by Part IX.B, and all reports submitted
to the FTC pursuant to Part XI.

**XIII.  ACKNOWLEDGMENT OF RECEIPT OF CONSENT DECREE**

**IT IS FURTHER ORDERED** that Defendant, within five (5) business of receipt of this
Decree as entered by the Court, must submit to the Commission a truthful sworn statement
acknowledging receipt of this Decree.

**XIV.  RETENTION OF JURISDICTION**

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for
the purposes of construction, modification, and enforcement of this Decree.

**JUDGMENT IS THEREFORE ENTERED** in favor of Plaintiff and against Defendant,
pursuant to all the terms and conditions recited above.

DATED:  January 31st, 2012 _____
                                       UNITED STATES DISTRICT JUDGE

Consent Decree, Page 26 of 28

FOR PLAINTIFF UNITED STATES OF
AMERICA:


TONY WEST
Assistant Attorney General


MAAME EWUSI-MENSAH FRIMPONG
Acting Deputy Assistant Attorney General


MICHAEL S. BLUME
Director


KENNETH L. JOST
Deputy Director
Consumer Protection Branch


SANG H. LEE
ADRIENNE E. FOWLER
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
PO Box 386
Washington, DC 20044-0386
Telephone: 202-616-0219
Fax: 202-514-8742
Sang.H.Lee@usdoj.gov
Adrienne.E.Fowler@usdoj.gov


Dated: 1/30/12

FOR THE UNITED STATES
FEDERAL TRADE COMMISSION:


ROBERT J. SCHROEDER, DIRECTOR
Northwest Region
TRACY S. THORLEIFSON
JULIE MAYER
Attorneys
Federal Trade Commission
Northwest Region
915 Second Ave., Suite 2896
Seattle, WA 98174
Telephone: 206-220-630
Fax: 206-220-6366
tthorleifson@ftc.gov
jmayer@ftc.gov


Dated: 1/30/12

Consent Decree, Page 27 of 28

**FOR THE DEFENDANT:**

EDWIN L. HERBERT
Vice President-General Counsel
Asset Acceptance, LLC
28405 Van Dyke
Warren, MI 48093
Telephone: 586-446-1782
eherbert@assetacceptance.com

**COUNSEL FOR DEFENDANT:**

WILLIAM C. MACLEOD
Kelley Drye & Warren LLP
Washington Harbour, Suite 400, 3050 K Street, NW
Washington, D.C. 20007
Telephone: (202) 342-8811
wmacleod@kelleydrye.com

Dated: 1/30/12

Consent Decree, Page 28 of 28

# EXHIBIT C

Exhibit C
Page 97



# Repairing A Broken System

Protecting Consumers in Debt Collection
Litigation and Arbitration

Federal Trade Commission
July 2010

Exhibit C
Page 98

# Repairing A Broken System:

## Protecting Consumers in Debt Collection Litigation and Arbitration

### July 2010



### Federal Trade Commission

Jon Leibowitz, Chairman
William E. Kovacic
J. Thomas Rosch
Edith Ramirez
Julie Brill

Exhibit C
Page 99

date.[97]  In addition to the burdens this practice imposes on the court system, it is inconvenient and costly to consumers who have appeared in court, and then must re-appear in court when the case is rescheduled.[98]  Some courts have acted to deter this practice.  For example, according to a judge of the Blair County, Pennsylvania "Credit Card Court," if the plaintiff does not appear at an initial mandatory conciliation conference, the case is dismissed with prejudice.[99]  Courts also may impose sanctions on parties or their counsel to deter this practice, or order that they pay the costs of the consumers who have appeared for trial.  To the extent that judges conclude that a collector has engaged in this practice, they may want to consider taking similar measures.

## IV. Statutes of Limitations

States usually establish a particular period of time, known as the statute of limitations, to set the duration during which an action to compel payment of a debt may be brought.  Statutes of limitations help ensure that consumers can defend themselves in collection actions and that courts will have the evidence they need to resolve these disputes.[100]  Statutes of limitations also provide a bright line for collectors and consumers as to the date after which the collector should no longer file an action to collect on a debt.

In most states, the running of the statute of limitations does not extinguish the consumer's underlying debt.[101]  But if the collector files a legal action to recover on the debt, the consumer can raise the running of the statute of limitations as an affirmative defense.[102]  The running of the

---

97.  *See* sources in *supra* note 96; APPLESEED REPORT, *supra* note 23, at 27, 30; Pittman, Tr. V at 187 (describing his experience with a debt buyer with no access to documentary media: "If [any consumer] comes to court, [the debt buyer is] going to dismiss, because they can't get the proof.").

98.  *See* Donnelly, Tr. I at 146; Weinberg, Tr. I at 158.

99.  Carpenter, Tr. V at 183.  *See also* MASS. ANN. LAWS UNIF. SMALL CLAIMS RULES 7(c) (requiring that a judgment for the defendant, rather than a dismissal, must be entered if the defendant is present for the scheduled trial, the plaintiff does not appear or is not prepared to proceed to trial, and there is no good cause for a continuance).

100.  *See United States v. Kubrick*, 444 U.S. 111, 117 (1979) (statutes of limitations "protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise").

101.  In Mississippi and Wisconsin the expiration of the statute of limitations legally extinguishes the debt.  MISS. CODE ANN. § 15-1-3 (2009); WIS. STAT. ANN. § 893.05 (2009).

102.  *See, e.g.*, Evans, Tr. V at 89 (Florida); Gargano, Tr. IV at 119 (California); Lipman, Tr. I at 90 (Iowa); Surh, Tr. IV at 113 (California).  In Mississippi and Wisconsin, however, the expiration of the statute of limitations legally extinguishes the debt, thus making a suit on a time-barred debt subject to dismissal for failure to state a cause of action.  MISS. CODE ANN. § 15-1-3 (2009) (*see, e.g.*, *Lowery v. Statewide Healthcare Serv., Inc.*, 585 So. 2d 778, 780 (Miss. 1991)); WIS. STAT. ANN. § 893.05 (2009) (*see, e.g.*, *Klewer v. Cavalry Invs., LLC*, 2002 U.S. Dist. LEXIS 1778, *6, *8 (W.D. Wis. 2002)).

Exhibit C
Page 100

statute of limitations, however, does not prohibit the collector from using non-litigation means (such as collection telephone calls) to try to collect on the debt.[103]

Nearly all courts that have examined the propriety of suing or threatening to sue to collect on a debt that is older than the applicable statute of limitations (also known as "time-barred debt") have concluded that such practices violate the FDCPA.  In *Kimber v. Federal Financial Corp.*, the court held it was unfair and unconscionable in violation of Section 808 to sue on time-barred debt in light of the strong public policy favoring statutes of limitations and the likelihood that the "least sophisticated consumer" would "unwittingly acquiesce" to suit due to lack of awareness that the passage of time could be raised as a defense.[104]  It further held that to threaten suit on a time-barred debt was deceptive in violation of Section 807 because it "implicitly represented that [the collector] could recover in a lawsuit, when it [could] not properly do so."[105]  Most other courts addressing this issue have reached the same result.[106]  Industry groups have also adopted policies requiring members to refrain from suing or threatening suit on time-barred debts.[107]  The Commission agrees with the interpretation that the FDCPA bars actual or threatened suit to collect on time-barred debts.[108]

---

103. Even in the absence of a legal obligation to repay a debt, people may choose to pay for moral or other reasons. *See, e.g.*, John H. Langbein, *The Nonprobate Revolution and the Future of the Law of Succession*, 97 HARV. L. REV. 1108, 1121 (1983-1984) ("I found the belief widespread among credit industry professionals that voluntary payment is motivated largely by moral as opposed to legal considerations").

104. *Kimber v. Fed. Fin. Corp.*, 668 F. Supp. 1480, 1487 (M.D. Ala. 1987).

105. *Kimber*, 668 F. Supp. at 1489.

106. *Freyermuth v. Credit Bureau Servs., Inc.*, 248 F.3d 767 (8th Cir. 2001); *McCullough v. Johnson, Rodenberg & Lauinger*, 2009 U.S. Dist. LEXIS 69881 (D. Mont. 2009); *Ramirez v. Palisades Collection, L.L.C.*, 2008 U.S. Dist. LEXIS 48722 (N.D. Ill. 2008); *Larsen v. JBC Legal Group, P.C.*, 553 F. Supp. 2d 290 (E.D.N.Y. 2008); *Martsolf v. JBC Legal Group, P.C.*, 2008 U.S. Dist. LEXIS 6876 (M.D. Pa. 2008); *Rawson v. Credigy Receivables, Inc.*, 2006 U.S. Dist. LEXIS 6450 (N.D. Ill. 2006); *Thinesen v. JBC Legal Group, P.C.*, 2005 U.S. Dist. LEXIS 21637 (D. Minn. 2005); *Dunaway v. JBC & Assocs., Inc.*, 2005 U.S. Dist. LEXIS 37885 (E.D. Mich. 2005);  *Spencer v. Hendersen-Webb*, 81 F. Supp. 2d 582 (D. Md. 1999); *Stepney v. Outsourcing Solutions, Inc.*, 1997 U.S. Dist. LEXIS 18264 (N.D. Ill. 1997); *Martinez v. Albuquerque Collection Servs.*, 867 F. Supp. 1495 (D. N.M. 1994); *Beattie v. D.M. Collections, Inc.*, 754 F. Supp. 383 (D. Del. 1991); *but see Simmons v. Miller*, 970 F. Supp. 661 (S.D. Ind. 1997) (no FDCPA violation where suit had not been knowingly filed beyond statute of limitations); *Lindbergh v. Transworld Sys., Inc.*, 846 F. Supp. 175 (D. Conn. 1994) (no FDCPA violation where suit was not knowingly filed beyond statute of limitations).

107. *See, e.g.*, ACA Comment at 12 (collectors that "threaten or pursue litigation of an out of statute account do so in violation of the law and ACA's Code of Ethics").

108. Likewise, the Commission believes that threatening or commencement of arbitration  proceedings to collect on time-barred debts may violate Sections 807 and 808 of the FDCPA, 15 U.S.C. §§ 1692e, 1692f.  *See Kimber*, 668 F. Supp. at 1489.

Exhibit C
Page 101

## A.  Statute of Limitations Period

Most statutes of limitations on consumer debt begin to run from the date that the consumer defaulted on the debt.[109]  The period of time for the statute of limitations varies by state.  In addition, for each state, the period of time may vary with the particular kind of debt and circumstances under which it arose (*e.g.*, whether the debt arose under a written or oral contract).[110]

Roundtable participants said that it is sometimes difficult to determine which among several potential statutes of limitations is applicable to a particular debt.[111]  In Illinois, for example, recent case law clarified that the appropriate statute of limitations for an action to collect on credit card debt depends on whether the suit is based on a written contract.[112]  If the collector produces a written contract, a ten-year statute of limitations applies.  If the collector cannot do so, a five-year statute of limitations applies.

Uncertainty as to the applicable statute of limitations could harm both consumers and collectors.  For instance, if consumers are not certain as to how long collectors have to sue them, they may make partial payments on time-barred debt, thereby unintentionally reviving the statute of limitations.  In addition, if collectors are uncertain as to the applicable statute of limitations, they may inadvertently file actions to recover on time-barred debt.[113]

---

109.  *See, e.g.*, NAT'L CONSUMER LAW CTR., COLLECTION ACTIONS §§ 3.7.6, 3.7.7 (1st ed. 2008) (hereinafter NCLC COLLECTION ACTIONS).

110.  *See, e.g.*, *Portfolio Acquisitions, LLC v. Feltman*, 391 Ill. App. 3d 642, 652 (Ill. App. Ct. 1st Dist. 2009) (holding that, under Illinois law, a credit card contract was oral rather than written and subject to the 5-year statute of limitations for oral contracts rather than the 10-year statute of limitations for written contracts where parol evidence would be required to show all essential terms and conditions of the contract).  *See also* Donnelly, Tr. I at 125 (ambiguity of complaint as to whether it refers to an account-stated or an oral contract, which have different applicable statutes of limitations); Markoff, Tr. I at 98; Lipman, Tr. I at 106-107, 123.

111.  *See, e.g.*, NARCA Comment at 7 ("several different statute of limitations *may* apply to a debt claim") (emphasis added); Coleman, Tr. IV at 95; Debski, Tr. V at 121; Donnelly, Tr. I at 125; Edelman, Tr. I at 82; Evans, Tr. V at 101, 121; Flitter, Tr. V at 98; Kinkley, Tr. IV at 85; Lipman, Tr. I at 106; Naves, Tr. IV at 127, 145-46; Newburger, Tr. IV at 92; Sinsley, Tr. I at 84.  *See also Florida Consumer Turns Tables on Debt Collector – Sued for $800.00 Dollars, Consumer Collects $120,000.00 Dollars From Debt Collector*, YAHOO! NEWS, Mar. 1, 2010, *available at* http://www.prweb.com/releases/2010/03/prweb3657014.htm (describing consumer's defense of state collection action and subsequent pursuit of federal FDCPA action against collector for suit on time-barred debt, where collector filed based on the wrong state's statute of limitations and where contract was held to be oral rather than written).

112.  *See Portfolio Acquisitions*, 391 Ill. App. 3d at 652.

113.  *See, e.g.*, Asset Comment at 3 (some cases involving allegations of suit on time-barred debt involve "intricate legal issues" such as choice of law provisions and distinguishing between written and oral contracts); NARCA Comment at 6-7 (actions should be governed by the statute of limitations of the forum state, not the state where the credit agreement originated).

24

Exhibit C
Page 102

Roundtable participants discussed whether a single, uniform statute of limitations for consumer debt cases would reduce such uncertainty where it exists. Many participants favored this concept in theory, although consumer advocates and collector representatives recognized that they likely would differ widely as to how long such a statutory period should be,[114] and they expressed serious reservations about Congress establishing a national standard.[115] Most participants preferred that states continue to perform their traditional role in setting statutes of limitations for debt collection actions,[116] though many expressed that making state statutes more uniform would be beneficial for both collectors and consumers.[117]

To the extent that states conclude there is uncertainty as to the applicable statute of limitations for a debt or how to apply it, the Commission recommends that they consider modifying their laws to reduce the uncertainty. If state statutes of limitations for consumer debts are clear, simple, and uniform, consumers and collectors stand to benefit.

## B.  Collecting on Time-Barred Debt

Roundtable participants discussed the collection of time-barred debt. As noted above, state law generally does not prohibit collectors from using methods other than threatening to file or filing an action in court[118] to collect on time-barred debt. The two major issues participants discussed were whether the FDCPA should be amended to prohibit the collection of such debt and whether the law should permit payments on such debt to "revive" the unpaid amount of the debt.

---

114.  *See*, *e.g.*, Kinkley, Tr. IV at 141-42; Moore, Tr. IV at 146-47; Naves, Tr. IV at 127, 145-46; Newburger, Tr. IV at 148.  *See also* ACA Comment at 15 (promoting a uniform statute of limitations of 10 years across all jurisdictions); Cada Comment at 1 (11/22/09) (suggesting all states should adopt a statute of limitations of 4 years); Staulcup Comment at 1 (favoring a uniform statute of limitations of 7 years).

115.  Proposed Levin Amendment SA 1097 to the Credit Card Act of 2009 would have amended the Truth in Lending Act to provide for rulemaking to establish a uniform statute of limitations for collecting debt on credit card accounts after the accounts had been closed by the creditor or the cardholder, but this amendment was not included in the Credit CARD Act of 2009.  CQ Congressional Record Service, Congressional Record, Senate, Page S5445, May 13, 2009.

116.  *See* Abrams, Tr. V at 121; Coffey, Tr. V at 121; Debski, Tr. V at 121; Faulkner, Tr. V at 121-22; Flitter, Tr. V at 122; Gagnon, Tr. V at 122; Groves, Tr. V at 122; McNulty, Tr. V at 123; Needleman, Tr. V at 123; Redmond, Tr. V at 123; Rosmarin, Tr. V at 123.  *See also* Evans, Tr. V at 121; Lebedeff, Tr. V at 123; Zezulinski, Tr. V at 123.

117.  *See*, *e.g.*, Kinkley, Tr. IV at 141-43; Naves, Tr. IV at 127, 145-46; Newburger, Tr. IV at 148.

118.  Recent statutory reform in North Carolina provides that it is an unfair practice for a debt buyer collector to "[bring] suit or [initiate] an arbitration proceeding against the debtor *or otherwise [attempt] to collect on a debt* when the [collector] knows, or reasonably should know, that such collection is barred by the applicable statute of limitations."  N.C. Gen. Stat. § 58-70-115(4) (emphasis added).

Exhibit C
Page 103

Participants differed in their views about whether the FDCPA should be amended to bar the collection of time-barred debt.  Most collector participants favored continuing to allow the collection of time-barred debt, provided that collectors neither sue nor threaten to sue the consumers from whom they are trying to collect.[119]  Many consumer advocates asserted that the FDCPA should prohibit such collection attempts, or, in the alternative, that collectors should explicitly be required to disclose to consumers that they cannot be sued to collect on the debt.[120]  Collector representatives countered that making such a disclosure would require that the collector interpret state law as to the applicable statute of limitations, which state officials could construe as the unauthorized practice of law.[121]

The Commission takes no position on whether the FDCPA should be amended to preclude collectors from collecting debt that they know or should know is time-barred.  Nevertheless, because most consumers do not know or understand their legal rights with respect to the collection of time-barred debt, the Commission believes that in many circumstances such a collection attempt may create a misleading impression that the collector can sue the consumer in court to collect the debt, in violation of Section 5 of the FTC Act and Section 807 of the FDCPA.[122] To avoid creating this misleading impression, collectors would need to disclose clearly and prominently to consumers before seeking payment on such time-barred debt that,

---

119. *See, e.g.,* Debski, Tr. V at 88; Sinsley, Tr. I at 86; *but see also* Groves, Tr. V at 85 ("it's clear that collecting on out-of-stat[ute] consumer debt is a bad idea").

120. *See, e.g.,* AARP Comment at 2 (favors requiring an affirmative disclosure about the statute of limitations when collecting time-barred debts); Barry, Tr. I at 120 (FDCPA should be amended to require disclosure to consumer that the statute has expired); Edelman, Tr. I at 83 (stated he has seen debt buyers "badger somebody into making a small payment" the only purpose of which is to re-trigger the statute of limitations), 94 (stated debt buyers frequently send collection letters on time-barred debts implying that there is still "a binding, legally enforceable obligation"); Edelman Comment at 20 (collecting time-barred debts should be declared an unfair or deceptive practice unless there is a reasonable basis to believe the debts are not time-barred); Flory, Tr. IV at 139 (consumers are told to send a little bit of money to "show good faith" even where they do not owe the medical bill or their insurance company should be paying it); Kinkley, Tr. IV at 138-39 ("And there are a lot of debt collectors who sort of trick somebody and say: Just send me five bucks" without disclosing that such payment would make "a debt that's uncollectible judicially now collectable"); NCLC Comment at 5 (collectors should be required to clarify that consumers cannot be sued for non-payment of a time-barred debt); NEDAP comment at 5 (FDCPA language should be amended to explicitly prohibit debt collectors from filing suits on time-barred debts); Nepveu, Tr. I at 91 (consumers do not know that it matters how long ago something happened); Weinberg, Tr. I at 96 (has seen debt buyers scare senior citizens into authorizing small payments on aged debts that they really don't recognize in order to re-trigger the statute of limitations); *but see also* Donnelly, Tr. I at 121 (consumers wouldn't understand such disclosures).

121. *See, e.g.,* Andersen, Tr. I at 116; Sargis, Tr. IV at 135; Sinsley, Tr. I at 117-18.  *See also* ACA Comment at 14 (consumer disclosure might lead consumers mistakenly to believe that the debt is no longer valid).

122. FTC Act § 5(a), 15 U.S.C. § 45(a); FDCPA § 807, 15 U.S.C. § 1692e.  In addition, the failure to disclose this information may violate state laws prohibiting unfair and deceptive acts and practices.

Exhibit C
Page 104

because of the passage of time, they can no longer sue in court to collect the debt or otherwise compel payment.[123]

The second issue related to collecting on time-barred debt roundtable participants addressed was the "reviving" of such debt. In many states, making a payment on a debt after it has gone into default triggers the start of a new statute of limitations period for the entire debt, even if the original statute of limitations period has already expired.[124] For example, if such a state has a three-year statute of limitations for credit card debt and it has been five years since a consumer paid on his $3,000 credit card debt, the collector could not lawfully sue him to collect on the debt. But if he decides to pay the collector $10, the payment would start a three-year period during which the collector could sue for the remaining $2,990.[125] Debt collectors generally do not disclose to consumers that making any payment on a time-barred debt revives the collector's ability to sue to collect on the entire debt.[126]

Roundtable participants differed in their views about whether a payment should revive the statute of limitations on a time-barred debt. Some opined that state law should continue to allow the revival upon payment of time-barred debts.[127] Other participants contended that state law should be amended so that a payment on a time-barred debt does not revive the statute of limitations.[128] Still others asserted that state law should be changed to require that the collectors

---

123. In some circumstances, collecting on time-barred debt could be an unfair act or practice under Section 5 of the FTC Act or state laws prohibiting unfair acts or practices. For collecting on time-barred debt to be unfair under Section 5 of the FTC Act, the Commission would have to demonstrate that "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." FTC Act § 5(n); 15 U.S.C. § 45(n). Determining whether an act or practice is unfair is a fact-specific inquiry.

124. *See, e.g.*, NCLC COLLECTION ACTIONS, *supra* note 109, at § 3.7.7.3.1.

125. For sake of simplicity, we have not included in this amount additional interest or fees that the credit contract may impose.

126. Most consumers do not understand that a payment will revive the statute of limitations. Some roundtable participants suggested that many consumers do not even understand the basic concept that a statute of limitations prevents collectors from suing to collect on debts after the passage of a period of time. *See, e.g.*, Nepveu, Tr. I at 91; *but see also* Lerch, Tr. I at 100 (consumers do know about the concept that when something happened too long ago, suit is barred).

127. *See, e.g.*, Debski, Tr. V at 118-19 (no need for disclosure or affirmation when consumer continues to pay on an out-of-statute debt).

128. *See, e.g.*, Rosmarin, Tr. V at 96.

Exhibit C
Page 105

disclose to consumers the effect of paying on a time-barred debt, or to require consumers to make a knowing affirmation that they waive their rights to be immune from suit.[129]

The Commission recommends that states in which a partial payment revives the statute of limitations consider modifying their laws so that a payment on a time-barred debt does not revive the debt unless the consumer is aware of and acknowledges its revival.  Otherwise, consumers do not expect that a partial payment toward a time-barred debt will have the serious, adverse consequence of starting a new statute of limitations during which the collector can sue to collect the entire debt.  Limiting consumers' responsibility to the amount of the partial payment on a time-barred debt would conform the law to reasonable consumer expectations.

In states where laws continue to provide that a partial payment on a time-barred debt revives it, the Commission believes that in many circumstances a collector's attempt to collect a debt that it knows or should know is time-barred may create a misleading impression as to the consequences of making such a payment, in violation of Section 5 of the FTC Act and Section 807 of the FDCPA.[130]  To avoid creating a misleading impression, collectors would need to disclose clearly and prominently to consumers prior to requesting or accepting such payments that (1) the collector cannot sue to collect the debt and (2) providing a partial payment would revive the collector's ability to sue to collect the balance.

---

129. *See, e.g.*, AARP Comment at 2 (creditors should be required to disclose affirmatively that debt is time-barred and that making partial payment will revive the obligation); Evans, Tr. V at 119-20 (favors a disclosure requirement for consumers paying on time-barred debts because "we have to make sure [consumers] understand what they're doing and they're doing it with knowledge"); Faulkner, Tr. V at 81-82 ("it should be an unfair practice to buy or sell out-of-statute debts" and, without a disclosure, consumers are misled to believe they are under threat of suit on time-barred debts); Lebedeff, Tr. V at 84-85 (familiar with collection practice of asking for a token payment to prolong statute or revive an out-of-statute debt obligation); Rosmarin, Tr. V at 118 (disfavors reviving a time-barred debt through subsequent payment except when consumers write affirmative statements evincing understanding of their lack of legal obligation to pay and affirming that they still want to pay); *but see also* ACA Comment at 14 (notification that a debt is time-barred might confuse consumers); Midland Credit Management (Midland) Comment at 3 (providing consumers with more information regarding an account's legal status would only confuse consumers and should not be attempted).

130. FTC Act § 5(a), 15 U.S.C. § 45(a); FDCPA § 807, 15 U.S.C. § 1692e.

28

Exhibit C
Page 106

## C.  Suits on Time-Barred Debts

Many consumer advocates and some judges expressed the view that some collectors regularly sue consumers on time-barred debts.[131]  Some consumer advocates suggested that debt buyers are more likely than original creditors to threaten or bring suits on time-barred debts.[132] One New York legal services provider analyzed a sample of all the debt collection cases in its office over an eighteen-month period and found that over fifty percent of the cases for which sufficient information was available were filed after the statute of limitations period had expired. In addition, in thirteen percent of all cases, the debt's time-barred status was apparent from the face of the complaint.[133]  On the other hand, many collector representatives maintained that it would be against a collector's interest to sue on a time-barred debt, and that such suits are rarely if ever filed.[134]

A significant consumer protection problem related to suits on time-barred debt appears to arise from the combination of collectors filing them and consumers not defending them.  Because an expired statute of limitations is an affirmative defense in most states, collectors have no obligation to allege in the complaint that the debt is not time-barred, and many collectors do not

---

131.  *See, e.g.*, Abrams, Tr. V at 96-97; Coffey, Tr. V at 95; DC 37 Comment at 4; Edelman, Tr. I at 82-84; Edelman Comment at 18; Evans, Tr. V at 89; Faulkner, Tr. V at 108; Lipman, Tr. I at 89; McNulty, Tr. V at 95; NEDAP Comment at 4; Rosmarin, Tr. V at 83; *but see also* Phillips, Tr. I at 86-87 ("we don't know what the instance is of filing suits beyond the statute of limitations because we don't have the data" and the majority of debt collection complaints are silent as to the relevant information); Weinberg, Tr. I at 100 ("so many of the debt buyers have no . . . reliable information as to the date of last payment or date of default . . . . I think a lot of lawsuits are filed where the lawyer has made no effort to determine whether it's beyond the statute of limitations because [the lawyer has] no information.").  Note that case law has established that it is generally a violation of the FDCPA for a collector to sue or threaten to sue on a time-barred debt.  *See, e.g.*, *Kimber v. Fed. Fin. Corp.*, 668 F. Supp. 1480, 1487 (M.D. Ala. 1987); *Ramirez v. Palisades Collection LLC*, 2008 U.S. Dist. LEXIS 48722, *13 (N.D. Ill. June 23, 2008); *McCorriston v. L.W.T., Inc.*, 536 F. Supp. 2d 1268, 1271 n.2 (M.D. Fla. 2008).

132.  *See, e.g.*, Edelman, Tr. I at 82 ("I think it's very common among the debt buyers"); Faulkner, Tr. V at 81-82 ("There are people in the debt-buying industry [who] make it a practice to buy primarily . . . out-of-statute debt."); Kinkley, Tr. IV at 84 (speaking about collection rather than litigation).

133.  Letter to FTC from Robert A. Martin of DC 37 Municipal Employees Legal Services, Feb. 11, 2010 (on file with FTC), at 1-2, supplementing the information described in DC 37 Comment.

134.  *See, e.g.*, ACA Comment at 12; Andersen, Tr. I at 115; Asset Comment at 3-4; Coleman, Tr. IV at 96; Debski, Tr. V at 88-89; Midland Comment at 2; Gagnon, Tr. V at 94; Lerch, Tr. I at 100; Markoff, Tr. I at 98-9; NARCA Comment at 7; Needleman, Tr. V at 82-83; Newburger, Tr. IV at 111; Redmond, Tr. V at 124-25; Sinsley, Tr. I at 84; *see also* Groves, Tr. V at 85-87 (collecting as well as filing suit on time-barred debt is a "bad idea").

Exhibit C
Page 107

include this information.[135]  If consumers do not defend, there is no one to raise the defense that the debt is time-barred.  Indeed, some judges who participated in the roundtables stated that, even if a debt collection action appears to be time-barred, it would be improper for courts to consider affirmative defenses that no party had raised.[136]  As a result, some courts appear to be granting default judgments on time-barred debt.

The Commission recommends that states change their laws to require collectors to prove that the debts they are collecting are not time-barred, rather than imposing on consumers the burden of raising the running of the statute of limitations as an affirmative defense.  As discussed above, states also should revise their laws to require that collectors set forth in their complaints the date of default and the applicable statute of limitations.[137]  These changes would highlight the statute of limitations issue in debt collection litigation for consumers and make it appropriate for courts to consider the issue before granting default judgments to collectors.

Federal action also could assist in decreasing the extent to which default judgments are entered in actions based on time-barred debts.  The Commission recommends that Congress amend Section 809(a) of the FDCPA to require that collectors include the date of default in the validation notices they provide to consumers at the outset of the collection process.[138]  If collectors are required to have this information when collection begins, then it should be readily available at the time an action is filed.  Further, because increased enforcement actions against

---

135. Few complaints currently state the date of default or the length of the applicable statute of limitations.  *See*, *e.g.*, Abrams, Tr. V at 97; Donnelly, Tr. I at 89, 107; Evans, Tr. V at 90-91; Hillebrand, Tr. IV at 112-13; Kinkley, Tr. IV at 85; Lipman, Tr. I at 89-90; Moiseev, Tr. I at 113-14; Phillips, Tr. I at 87; Rosmarin, Tr. V at 96; Surh, Tr. IV at 113-14. In some states, however, collectors are required to include this information in their complaints.  *See*, *e.g.*, N.Y. CITY CIV. CT. CHIEF CLERK'S MEMORANDUM 186 (May 13, 2009); Fisher, Tr. V at 195; Lebedeff, Tr. V at 93.  In addition, some creditor attorneys have adopted as a best practice the inclusion of such information in their complaints.  *See*, *e.g.*, Buckles, Tr. I at 133 (routinely provides date of last payment in complaint); *but see* Debski, Tr. V at 115.

136. *See*, *e.g.*, Abrams, Tr. V at 97 (often saw cases suing on out-of-statute debt but "I felt my hands were tied"); Evans, Tr. V at 90; Lipman, Tr. I at 90.

137. Similarly, the Commission believes that arbitration forums should require that collectors initiating arbitration proceedings state the date of default and applicable statute of limitations, and that arbitrators should determine whether the claim is time-barred.

138. Pursuant to Section 809(a) of the FDCPA, 15 U.S.C. § 1692g(a), a collector must send, within five days after the initial communication with the consumer in connection with the collection of a debt, a written "validation notice" containing: (1) the amount of the debt; (2) the name of the creditor to whom the debt is owed; (3) a statement that unless the consumer, within thirty days after receipt of the notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector; (4) a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector; and (5) a statement that, upon the consumer's written request within the thirty-day period, the debt collector will provide the consumer with the name and address of the original creditor, if different from the current creditor.

30

Exhibit C
Page 108

collectors who violate the FDCPA by threatening to file or filing time-barred lawsuits would deter such practices, the Commission intends to focus more of its enforcement efforts on those who engage in such conduct.[139]

## V.  Garnishment of Exempt Funds in Bank Accounts

Many roundtable participants identified the freezing and garnishment of exempt funds in bank accounts as a critical issue for consumers.  If a collector obtains a judgment against a consumer, then the collector may seek to recover on that judgment by attempting to garnish the consumer's bank account.  Although each state has its own garnishment rules, a collector usually must apply to a state court for a garnishment order.  A collector typically must give notice of its application to the consumer,[140] and the collector generally provides a copy of the application to the bank.  Upon receiving this notice, the bank typically "freezes" the funds in the consumer's account pending resolution of the application.  If the state court issues a garnishment order, then the collector serves a copy of the order on the bank and the bank pays the collector from the funds in the account.

Federal and state law declare that certain funds in the bank accounts of consumers are exempt from garnishment.[141]  Federal law generally exempts Social Security, Supplemental Security Income (SSI), veterans' benefits, and numerous other federal benefits from garnishment.[142]  Many state laws exempt similar state benefits from garnishment.  The fundamental objective of these laws is to ensure that the garnishment of these funds by judgment creditors does not create undue hardship for benefit recipients, many of whom are indigent.[143]

Notwithstanding such laws, banks frequently freeze accounts that contain exempt funds pending resolution of the collector's application for a garnishment order.[144]  Such freezes create

---

139. For threatening to file time-barred suits, *see United States v. Whitewing Fin. Group*, No. H-06-2102 (S.D. Tex. June 22, 2006); *FTC v. Capital Acquisitions & Mgmt. Corp.*, No. 04C7781 (N.D. Ill. Dec. 2, 2004).

140. Consumers typically do not receive such notices until after their accounts have been frozen by the bank. This ensures that consumers do not withdraw all funds from their accounts in anticipation of a freeze or garnishment.

141. There are limited exceptions pursuant to which exempt funds may be garnished.  For example, exempt funds are sometimes reachable to pay federal income taxes, child support or alimony.  *See generally* NCLC COLLECTION ACTIONS, *supra* note 109, at § 12.5.10.

142. *See, e.g.*, 42 U.S.C. §§ 407, 1383 (Social Security and SSI benefits); 38 U.S.C. § 5301 (veterans' benefits).  *See generally* NCLC COLLECTION ACTIONS, *supra* note 109, at Appendix C.

143. Hillebrand, Tr. IV at 238 ("you know, you don't want to leave a person penniless when there's food to be bought and kids to be sent to school and rent to be paid"); Kinkley, Tr. IV at 226 (exempt funds are intended to be spent on rent, food, and subsistence).

144. *See, e.g.*, Hillebrand, Tr. IV at 210-11; Markoff, Tr. I at 175; Moore, Tr. IV at 217-18; Nepveu, Tr. I at 176-77; Newburger, Tr. IV at 227; Tyler, Tr. V at 213-14; Weinberg, Tr. I at 178-79; Wilner, Tr. V at 213.

Exhibit C
Page 109

# EXHIBIT D

July 28, 2016

# SMALL BUSINESS REVIEW PANEL FOR
# DEBT COLLECTOR AND DEBT BUYER RULEMAKING

# OUTLINE OF PROPOSALS UNDER CONSIDERATION
# AND ALTERNATIVES CONSIDERED

I.   Introduction ................................................................................................................1

    A.  Background ......................................................................................................1

    B.  Scope of proposals under consideration...........................................................4

II.  The SBREFA Process ...................................................................................................5

III. Information Integrity and Related Concerns ...............................................................5

    A.  Proposals under consideration to prohibit unsubstantiated claims of indebtedness ........6

    B.  Proposal under consideration to require review and transfer of certain information ......13

    C.  Validation notice and statement of rights ......................................................15

IV.  Other Consumer Understanding Initiatives................................................................18

    A.  Litigation disclosure.....................................................................................18

    B.  Time-barred debt and obsolete debt ...............................................................19

V.   Collector Communication Practices ...........................................................................22

    A.  Proposals under consideration regarding contact frequency and the leaving of messages........................................................................................................23

    B.  General time, place, manner restrictions .......................................................28

    C.  Issues concerning decedent debt ...................................................................32

    D.  Consumer consent.........................................................................................34

VI.  Additional Proposals ..................................................................................................35

    A.  Prohibition on transferring debt to certain entities or in certain circumstances............35

    B.  Recordkeeping...............................................................................................35

VII.  Potential Impacts on Small Entities ........................................................................36

    A.  Entities subject to the proposals under consideration.....................................36

i

B.  Bureau review of debt collection processes and costs ........................................................ 37

C.  Activities of debt collectors and impact of recent regulatory changes ............................ 38

D.  Impacts on debt collectors of the proposals under consideration .................................. 47

VIII.   Cost of Credit to Small Entities ............................................................................................ 71

Appendices

Exhibit D
Page 112

## I. Introduction

### A. Background

Debt collection is a critical part of the consumer credit market infrastructure. Collection of consumer debts reduces the costs that creditors incur through their lending activities. Collection efforts directly recover some amounts owed to debt owners and may indirectly support responsible borrowing by underscoring consumers' obligations to repay their debts and providing them with an incentive to do so. The reductions in creditors' costs, in turn, may allow creditors to extend more credit at lower prices.

While debt collection may benefit consumers at large by reducing the price and increasing the availability of credit, in the debt collection market, collectors' incentives generally are to recover as much money as they can from each consumer subject to collection efforts by any lawful means. Collectors generally are paid based on how much they collect. Consumer choice provides little, if any, constraint on the behavior of collectors. Consumers generally choose between creditors based on factors such as the creditor's identity and the credit terms offered, not who might collect on the debt for these creditors—or how they might collect—if the consumer later defaults on the loan. And when a consumer does default, that consumer has no alternative but to deal with whatever collector the debt owner has chosen. With consumers unable to "vote with their feet," collectors have only limited incentive to collect debts in a manner that consumers would prefer.

In 1977, Congress enacted the Fair Debt Collection Practices Act (FDCPA) to "eliminate abusive debt collection practices by debt collectors" and "to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."[1] The FDCPA imposes a range of restrictions and disclosure requirements on collectors' conduct. The FDCPA generally covers the collection activities of debt collectors collecting on others' debts and debt buyers (collectively "debt collectors" in this Outline unless otherwise specified) but not the collection activities of first-party debt collectors (*i.e.*, creditors collecting on debts owed to them). Many states also have enacted laws similar to the FDCPA to regulate the conduct of debt collectors.[2]

Even with these laws in place, debt collection remains a major source of consumer complaints, lawsuits, and enforcement actions. Since the Consumer Financial Protection Bureau (Bureau) commenced operations in 2011, it has brought more than 25 debt collection cases against first- and third-party collectors alleging FDCPA violations or unfair, deceptive, and abusive debt collection acts and practices in violation of the Dodd-Frank Act. In these cases, the Bureau has ordered over $100 million in civil penalties, over $300 million in restitution to consumers, and billions of dollars in debt relief to consumers. During this same five-year period, the Federal Trade Commission (FTC) has brought more than 40 debt collection cases alleging FDCPA violations or unfair or deceptive acts and practices in violation of the FTC Act, and states have brought numerous additional actions against debt collectors for violating state debt collection and consumer protection laws. In its supervisory work, the Bureau similarly has identified many violations of the FDCPA through its examinations of debt collectors, as well as violations

---

[1] 15 U.S.C. 1692(e).

[2] To the extent that some of these state laws are interpreted consistently with the FDCPA, it is possible that clarifying the FDCPA's application would provide greater guidance for collectors regarding some state laws as well.

of the Dodd-Frank Act by first-party debt collectors.

Notwithstanding these governmental enforcement and supervisory efforts, consumers for many years have submitted more complaints to the FTC about debt collectors than any other single industry,[3] and that trend is continuing at the Bureau.[4]  Indeed, since the Bureau began accepting debt collection complaints in July 2013, the Bureau has received more than 200,000 consumer complaints regarding debt collection practices.[5]  The leading reason for debt collection complaints to the Bureau in 2015 was consumers being contacted for debts they report they do not owe.[6]  Consumers also commonly complain that collectors harass them or make false or misleading statements, take or threaten to take illegal actions, fail to send required notices, or improperly contact or share information with third parties.[7]

In addition to submitting complaints, consumers continue to file thousands of private actions each year against debt collectors that allegedly have violated the FDCPA.  Over the past five years alone, consumers have brought more than 50,000 federal actions alleging that debt collectors have violated the FDCPA, with nearly 12,000 such lawsuits being filed in 2015.[8]  While these cases may bring redress for those involved, differing court decisions or decisions in different jurisdictions have created some splits in the FDCPA's interpretation.  These decisions can create uncertainty for consumers and industry alike.

To protect consumers more effectively, the Bureau has decided to consider issuing debt collection regulations that implement the FDCPA and other statutory authorities and that cover the activities of debt collectors and debt buyers.  Until the creation of the Bureau, no federal agency was authorized to issue comprehensive regulations to implement the FDCPA, a statute passed in 1977.[9]  The Dodd-Frank Act also empowered the Bureau to issue regulations

---

[3] Between 2010 and 2012, for example, the FTC received more than 400,000 total complaints about debt collection, representing between 24 and 27 percent of all complaints received by the FTC during those years.  Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2013*, at 14 (2013), *available at* http://files.consumerfinance.gov/f/201303_cfpb_March_FDCPA_Report1.pdf; Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2012*, at 6 (2012), *available at* http://files.consumerfinance.gov/f/201203_cfpb_FDCPA_annual_report.pdf.

[4] During 2015 alone, the Bureau handled over 85,000 debt collection complaints—more than about any other consumer financial product or service that the Bureau's complaint system monitors.  Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2016*, at 18 (2016) (hereinafter 2016 FDCPA Annual Report), *available at* http://files.consumerfinance.gov/f/201603_cfpb-fair-debt-collection-practices-act.pdf.  (This number reflects aggregate debt collection complaints for 2015, regardless of whether the debt collector was subject to the FDCPA.)

[5] *See* 2016 FDCPA Annual Report, at 19; Bureau of Consumer Fin. Prot., *Fair Debt Collection Practices Act: CFPB Annual Report 2014*, at 2 (2014), *available at* http://files.consumerfinance.gov/f/201403_cfpb_fair-debt-collection-practices-act.pdf.

[6] *See* 2016 FDCPA Annual Report, at 17-19.  Of the 85,200 total complaints, the most common debt collection complaint is about continued attempts to collect a debt that the consumer reports is not owed (this accounts for 40 percent of total complaints).  Of the complaints within this category, the vast majority of consumers report that the debt is not their debt (63 percent) or that the debt was paid (26 percent), while the remaining consumers report that the debt resulted from identity theft (six percent) or was discharged in bankruptcy (four percent).

[7] *Id.* at 18-20.

[8] *See id.* at 15.

[9] 15 U.S.C. 1692*l*(d).

2

prohibiting covered persons from engaging in unfair, deceptive, and abusive acts and practices and requiring disclosures to permit consumers to understand the costs, benefits, and risks associated with consumer financial products and services, including debt collection.[10]  (The FDCPA and excerpts of the Dodd-Frank Act are attached as Appendix A.)  Covered persons under the Dodd-Frank Act include not only debt collectors covered by the FDCPA, but also creditors who are collecting or attempting to collect on debts that relate to a consumer financial product or service.[11]

The Bureau issued an Advanced Notice of Proposed Rulemaking (ANPR) for debt collection in November of 2013.[12]  The ANPR sought information about both first- and third-party collection issues including, among other things, the conduct of collectors in interacting with consumers in trying to recover on debts through the collection process; the quantity and quality of information in the debt collection system; debt collection litigation; and recordkeeping, monitoring, and compliance issues.  With regard to the FDCPA specifically, the ANPR also sought comment about interpreting the nearly forty-year old statute to address contemporary debt collection challenges, including questions such as how collectors apply the FDCPA to technology such as cell phones, text messages, and email.  The FDCPA has not been significantly amended to address such challenges, and reliance on case law alone has created uncertainty for stakeholders.  The Bureau's rulemaking seeks to decrease such uncertainty.[13]

The Bureau received more than 23,500 comments in response to the ANPR.  In developing this Outline of Proposals Under Consideration and Alternatives Considered (Outline), the Bureau has considered those comments, engaged in extensive consultation with both industry and consumer stakeholders, and conducted its own research and analysis.

In particular, the Bureau has been engaged in three major debt collection research projects to assist in making decisions in the rulemaking.  First, the Bureau has conducted a Survey of Consumer Views on Debt that examines the debt collection experiences and preferences of a nationally representative sample of consumers with credit records.[14]  Second, the Bureau has conducted and continues to conduct extensive consumer testing of model validation notices and other disclosures.  Third, the Bureau has conducted an industry survey to obtain a better sense of current collector practices and procedures, so that the Bureau will be able to make informed decisions about the potential costs associated with various rulemaking policy options.[15]

---

[10] Sections 1031(b) and 1032 of the Dodd-Frank Act, 12 U.S.C. 5531(b) and 5532.

[11] *See* 12 U.S.C. 5481(5), (6), (15)(A)(x).

[12] 78 FR 67848 (Nov. 12, 2013).

[13] This Outline has been prepared in preparation for a notice of proposed rulemaking, so the Bureau's statements herein regarding proposed interpretations of the FDCPA or Dodd-Frank Act do not represent final Bureau interpretations.  The Bureau is not, in this Outline, finding that conduct either violates or is permissible under the FDCPA or Dodd-Frank Act.

[14] A summary of preliminary results is attached at Appendix B; a full report on survey results will be published in the future.

[15] *See* Bureau of Consumer Fin. Prot., *Study of Third-Party Debt Collection Operations* (July 2016) (hereinafter Operations Study), *available at* http://www.consumerfinance.gov/data-research/research-reports/study-third-party-debt-collection-operations.

3

condition of obtaining the product or service for which the company pulled the report, even if the consumer would have disputed the debt had he or she learned of it earlier.

To address this harm, the Bureau is considering a proposal that would prohibit debt collectors from furnishing information about a debt to a consumer reporting agency unless the collector has communicated directly about the debt to the consumer, which usually would occur by the collector sending a validation notice.

## IV. Other Consumer Understanding Initiatives

In addition to proposals under consideration to provide a revamped FDCPA validation notice and Statement of Rights at the outset of the collections process, the Bureau is considering two other sets of interventions designed to address issues in the debt collection process that the Bureau believes many consumers may not understand.  The first such potential intervention is to require a brief disclosure regarding the possibility of litigation.  The second is to require disclosures and impose certain restrictions in connection with older debts that are beyond the applicable statute of limitations or generally barred from appearing on credit reports.

### A.  Litigation disclosure

1.  Why is the Bureau considering a proposal to require a litigation disclosure?

Debt collectors often seek to recover on consumer debt through litigation.  The FTC has concluded that "[t]he majority of cases on many state court dockets on a given day often are debt collection matters."[30]  But few consumers who are sued for allegedly unpaid debts actually contest those allegations in court.  Indeed, participants in a series of 2009 roundtables convened by the FTC estimated that between 60 and 95 percent of consumer debt collection lawsuits result in default judgments.[31]  Some consumers against whom default judgments are entered may have had valid defenses had they appeared to defend themselves in court.[32]

The Bureau believes that some consumers fail to defend because they lack familiarity with court processes, do not understand the consequences of not defending, and do not know where to find an attorney they can afford.  These consumers would benefit from additional information about debt collection litigation.

2.  Requirement to provide a litigation disclosure

The proposals under consideration would require debt collectors to provide a brief "litigation disclosure" in all written and oral communications in which they represent, expressly or by implication, their intent to sue.  The disclosure would inform the consumer that the debt collector intends to sue; that a court could rule against the consumer if he or she fails to defend a lawsuit; and that additional information about debt collection litigation, including contact information for others' legal services programs, is available on the Bureau's website and through

---

[30] FTC Collecting Consumer Debts Report, at 55.

[31] U.S. Fed. Trade Comm'n, *Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration*, at 7 (July 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf.

[32] *Id.* at iii.

calling the Bureau's toll-free telephone number.  Under the proposal under consideration, debt collectors would provide the disclosure at the same time as—and using the same medium in which—they represent that they intend to sue.  The Bureau does not anticipate providing model language at this time but is interested in receiving feedback from the SERs about the usefulness of model language.

**B.   Time-barred debt and obsolete debt**

   1.   Why is the Bureau considering proposals related to time-barred debt and obsolete debt?

Time-barred debt, sometimes referred to as "out of statute debt," is debt as to which the statute of limitations has expired.  In a few states, collectors are affirmatively prohibited from bringing suit on time-barred debt under state law, but the more common rule is that courts will dismiss lawsuits filed on such debt if the consumer proves the statute of limitations as an affirmative defense.  Most statutes of limitation fall in the three-to-six-year range, although in some jurisdictions they may extend to fifteen years for certain types of debt.[33]

One of the reasons states impose statutes of limitations on lawsuits to recover debt is because of a concern that evidence may become less reliable over time, making it more difficult for the parties and the courts to resolve the matter.  Because the risk of a lawsuit may play a major role in how consumers choose to respond to a demand for payment, consumer understanding regarding the nature and implications of time-barred debt is important.  Concepts related to statutes of limitations are challenging for consumers to understand, especially the fact that in some jurisdictions consumers may "revive" a debt and reset the statute of limitations by making a partial payment or acknowledging the debt in writing.

A related issue is obsolete debt, which is debt that, because of its age, is generally barred from appearing on credit reports under the Fair Credit Reporting Act.  This typically occurs approximately seven years after the delinquency began.  Again, because the risk of negative information appearing on a credit report may play a role in how consumers choose to respond to a collector's demand for payment, the Bureau believes that consumer understanding regarding the nature and implications of obsolete debt is important.

   2.   Proposal under consideration to prohibit suit and threats of suit on time-barred debt

The Bureau is concerned that some debt collectors sue or threaten to sue on time-barred debt. The consumer protection risks associated with these practices are plain.  Few consumers know that a statute of limitations can be used to defend against legal claims—much less whether their own debts are time-barred.  Debt collectors that sue on time-barred debt may secure judgments on claims against which consumers have viable defenses based on the statute of limitations. Similarly, debt collectors that threaten suit on time-barred debt take advantage of this lack of understanding by representing, expressly or by implication, that they are legally entitled to

---

[33] The statute of limitations applicable to a particular debt generally depends on state law and the type of debt.  The statutory period usually starts to run from the date of delinquency or the date of last payment. *See* U.S. Fed. Trade Comm'n, *The Structure and Practices of the Debt Buying Industry*, at 42 (Jan. 2013) (hereinafter FTC Debt Buying Industry Report), *available at* https://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf.

19

enforce the debt in court, thereby inducing consumers to pay debts they would not otherwise have paid (including debts they do not actually owe). The proposals under consideration would prohibit suit and threats of suit on time-barred debt.

3.  Proposal under consideration to require disclosures, and to waive revival, in connection with the collection of time-barred debt and obsolete debt

Consumer protection concerns exist even when a debt collector attempts to collect time-barred debt without suing or threatening suit. Again, this is because few consumers know the statute of limitations applicable to any particular debt or whether the limitations period has run. Consumers may take away from an attempt to collect a debt the implied claim that the debt is enforceable in court if they do not pay—a claim that is false for time-barred debts. Further, a consumer who does not know that the statute of limitations has run on a particular debt may pay or prioritize a debt, including one the consumer does not owe, over a different obligation.

These concerns are heightened in jurisdictions with so-called revival statutes. In these jurisdictions, the statute of limitations "revives"—that is, it starts anew—when the borrower makes a payment or acknowledges the debt in writing. The Bureau believes that most consumers are unaware of the potential legal consequences of making a payment or acknowledging a debt in writing. Indeed, many consumers may find it counterintuitive that making a payment—which they believe ought to have positive consequences for them—may actually have negative consequences.

The proposals under consideration would require disclosures whenever a debt collector seeks payment on time-barred debt and limit the collection of debts that can be revived. The purpose is to help ensure that consumers are neither deceived nor treated unfairly in connection with the collection of time-barred debt.

- Time-barred debt disclosure. The Bureau is considering a proposal that would require a debt collector to provide a time-barred debt disclosure when it seeks to collect a time-barred debt. The Bureau is considering whether a collector should be required to make this disclosure only if the collector knew or should have known that the debt was time-barred, or whether a collector should be strictly liable (*i.e.*, liability would attach regardless of the collector's state of knowledge).[34] The Bureau would develop a disclosure and refine its contents and design based on consumer testing.

  The disclosure itself would consist of a brief, plain-language statement informing the consumer that, because of the age of the debt, the debt collector cannot sue to recover it. The proposal under consideration would require debt collectors to include such a statement in the validation notice and in the first oral communication in which they request payment.[35] The Bureau is also considering whether debt collectors should provide the disclosure at additional intervals, including possibly in each communication in which they seek payment.

---

[34] As with other provisions of the proposed rule, the bona fide error defense under FDCPA section 813(c), 15 U.S.C. 1692k(c), would be available to debt collectors.

[35] Where a debt becomes time-barred during collections, debt collectors would be required to provide the disclosure in the first communication in which they seek payment after the statute of limitations has expired. If the first communication is oral, then the time-barred debt disclosure would also have to be provided in the first subsequent written communication. The Bureau is also considering whether to require the disclosure at additional intervals.

20

- Binding later collectors. Given the frequency with which debts are transferred between collectors, the Bureau is concerned that a consumer might rely on one debt collector's representation that a debt is time-barred only for a subsequent collector to sue the consumer after making a different determination about the same debt. To avoid this concern, the proposal under consideration would prohibit a subsequent collector from suing on a debt as to which an earlier collector provided a time-barred debt disclosure. The proposal under consideration would also require the later collector to provide a time-barred debt disclosure in the validation notice and the first oral communication in which it requests payment, and possibly at additional intervals. Earlier collectors would have to indicate when they transfer the debt to others if they have given the time-barred debt disclosure to the consumer.

- Obsolescence disclosure. The Bureau is concerned that consumers may make erroneous assumptions about credit reporting on debts that they are told cannot be sued on, and that these assumptions may lead them to take action they would not have taken otherwise. Therefore, the Bureau is considering whether to require a disclosure that would inform the consumer whether a particular time-barred debt generally can or cannot appear on a credit report. The Bureau would develop a disclosure and refine its contents and design based on consumer testing. The proposal under consideration would require that the disclosure appear on the validation notice, although the Bureau is also considering whether to require it at additional intervals. The Bureau seeks information from SERs about the frequency with which debt collectors furnish information to consumer reporting agencies on debts that are both time-barred and obsolete and the challenges of providing disclosures to consumers relating to obsolescence.

- Waiver of revival. Consumers may revive a time-barred debt under state law if they make a payment on it or acknowledge that the debt is theirs. Consumers may believe that these actions would be beneficial to them. To try to correct this impression, collectors could attempt to disclose that these actions in fact could permit collectors to subsequently file a lawsuit because the debt has been revived. However, the Bureau's testing to date suggests that consumers may not fully understand such a disclosure, because it seems counter-intuitive to them. Consequently, the Bureau is considering whether to prohibit collectors from collecting on time-barred debt that can be revived under state law unless they waive the right to sue on the debt. In other words, even if a consumer makes a payment or acknowledges the debt in writing, the rule would prohibit a debt collector from suing because the collector, by operation of the Bureau's rules, would have waived any right to sue by collecting on the debt.

- Alternatives considered. The Bureau has considered two alternative proposals, one to ban the sale of time-barred debt and one to ban the collection of time-barred debt. The Bureau is not currently planning to propose these alternatives because the other proposals under consideration described in this Outline may adequately address the risks to consumers posed by the sale and collection of time-barred debt. The Bureau also notes that banning the sale or collection of time-barred debt could have unintended consequences for consumers. For example, if collectors cannot sell or collect time-barred debt, they may have more incentive to sue consumers in advance of the expiration of the statute of limitations, a result which often is not in the interest of consumers who would prefer not to be sued or collectors who may incur costs related to litigation.

21

4. Proposal under consideration to require consumer acknowledgement before accepting payment on debt that is both time-barred and obsolete

If consumers cannot be subject to either lawsuits or credit reporting, the Bureau believes that it is especially important for them to know about their rights to ensure they do not pay as a result of a debt collector's unlawful conduct. The Bureau therefore is considering a proposal to prohibit a debt collector from accepting payment on such a debt until the collector obtains the consumer's written acknowledgement of having received a time-barred debt disclosure and an obsolescence disclosure. Debt collectors would be free to include, as a separate document that accompanies the validation notice, a form that consumers may use to acknowledge receipt. The Bureau does not anticipate providing a model form for this purpose.

## V. Collector Communication Practices

The second largest source of Bureau complaints about debt collection focuses on communication practices. Although the FDCPA has established multiple protections and requirements regarding debt collection communications throughout the debt collection lifecycle, consumers consistently complain about frequent or repeated collections telephone calls, disclosures of debts to third parties, and other concerns related to debt collection communications.[36] Communications-related conduct also drives a substantial number of FDCPA lawsuits.

Communications are also a major source of frustration and inefficiency for debt collectors, who often feel caught between different sets of FDCPA requirements, such as those requiring collectors to identify themselves as collectors and those prohibiting revealing the existence of a debt to third parties. In particular, many collectors feel that it is too legally risky for them to leave messages for consumers because of the risk that a third party might hear or see the message containing the required FDCPA content and thus learn of the debt. Thus, some collectors call consumers repeatedly without leaving messages, which in turn can leave consumers feeling frustrated and harassed.

The Bureau believes that improving the quality of information in the debt collection system and providing consumers with the initial disclosures discussed in part III might decrease the amount of time and effort that collectors spend trying to locate and initiate contact with consumers. Nevertheless, the Bureau is considering several other potential proposals to give consumers more control over the rhythm and channels of communications and to provide greater regulatory certainty for all parties. The most significant interventions under consideration include:

- Regulations to govern contact frequency and the leaving of messages;

- Regulations to govern the time, place, and manner of collector contacts; and

---

[36] Communication tactics ranked second in debt collection complaints submitted to the Bureau during 2015, and the majority of complaints in this category—52 percent, or almost 8,000 complaints during 2015—were about frequent or repeated telephone calls. *See* 2016 FDCPA Annual Report, *supra* note 4, at 19.

# EXHIBIT E

**SENATE JUDICIARY COMMITTEE**
**Senator Noreen Evans, Chair**
**2013-2014 Regular Session**

SB 233 (Leno and Correa)
As Amended April 22, 2013
Hearing Date: May 7, 2013
Fiscal: No
Urgency: No
BCP

## SUBJECT

Debt Buyers

## DESCRIPTION

This bill, the Fair Debt Buying Practices Act, would regulate the activities of a person or entity (debt buyer) that has bought charged-off consumer loans for collection purposes. Specifically, this bill would:

- prohibit a debt buyer from making any written statement in an attempt to collect a consumer debt unless the debt buyer possesses specified information;
- require the debt buyer to make that information available to the debtor, without charge, upon receipt of a request, within 15 days;
- require all settlement agreements between a debt buyer and a debtor to be documented in open court or otherwise in writing;
- require a debt buyer who receives a payment on a debt to provide a receipt or statement containing certain information;
- prohibit a debt buyer from initiating a suit to collect a debt if the statute of limitations on the cause of action has expired;
- require a debt buyer bringing an action on consumer debt to include certain information in his or her complaint; and
- prohibit an entry of judgment in favor of a plaintiff debt buyer unless business records, authenticated through a sworn declaration and proving ownership of the debt, are submitted by the debt buyer to the court.

This bill would provide that a debt buyer who violates the provisions of this bill is liable for specified damages, including costs and reasonable attorney's fees, but permits a debt buyer to avoid liability for unintentional bona fide errors.

This bill would also require a claim of exemption, and related financial statement form, to be provided to a judgment debtor by a levying officer, as specified.

(more)

Exhibit E
Page 122

## BACKGROUND

Debt buyers are companies that purchase delinquent or charged-off debts from a creditor for a fraction of the face value of the debt.  Those companies have become subject to increased scrutiny due to numerous complaints on behalf of consumers.  The Federal Trade Commission (FTC) issued a report in July 2010 examining debt collection litigation and arbitration proceedings that concluded the "system for resolving consumer debt collection disputes is broken" and recommended significant reforms.  (*Repairing a Broken System* (July 2010) Federal Trade Commission <http://www.ftc. gov/os/2010/07/debtcollectionreport.pdf > [as of May 3, 2013] at p. i.) The FTC further noted that:

> The report finds very few consumers defend or otherwise participate in debt collection litigation.  The Commission therefore recommends state and local governments consider making a variety of reforms to service of process, pleading, and court rules and practices to increase the ability of consumers to defend or otherwise participate in debt collection litigation.  The report also finds complaints and attachments in debt collection cases often do not provide adequate information for consumers to answer complaints or for judges to rule on motions for default judgment.  The FTC therefore recommends that courts more rigorously apply existing rules to require that collectors provide adequate information and that jurisdictions consider adopting rules mandating the information which must be included in or attached to the complaint. The report additionally finds that state statutes of limitations on filing actions to recover on debt are sometimes variable and complex, and generally not understood by consumers.  The Commission suggests that states consider modifying their laws to make it simpler to determine the applicable statute of limitations, and to require that collectors provide consumers with important information about their legal rights when collecting debt they know or should know is time-barred. (*Id.* at p. 2.)

Additionally, on October 24, 2012, the federal Consumer Financial Protection Bureau (CFPB) published a rule to allow the agency to federally supervise the larger consumer debt collectors.  The CFPB noted that:

> Approximately 30 million Americans have, on average, $1,500 of debt subject to collection.  Debt collectors often report consumers' collection status to the credit bureaus.  If they get the information wrong, this can be the difference between getting approved or denied for such financial products as a mortgage or a car loan.

> The consumer debt collection market covered by the rule includes three main types of debt collection: first, firms that may buy defaulted debt and collect the proceeds for themselves; second, firms that may collect defaulted debt owned by another company in return for a fee; and third, there are debt collection attorneys

that collect through litigation.  A single company may be involved in any or all of these activities.  By expanding the supervision program to oversee the nonbanks that are larger participants in the consumer debt collection market, the Bureau will now have a window into every stage of the process – from the origination of credit to debt collection.

The CFPB's supervision authority over these entities will begin when the rule takes effect on January 2, 2013.  Under the rule, any firm that has more than $10 million in annual receipts from consumer debt collection activities will be subject to the CFPB's supervisory authority.  This authority will extend to about 175 debt collectors, which account for over 60 percent of the industry's annual receipts in the consumer debt collection market.  (*Consumer Financial Protection Bureau to oversee debt collectors* (Oct. 24, 2012) Consumer Financial Protection Bureau <http://www.consumerfinance.gov/pressreleases/consumer-financial-protection-bureau-to-oversee-debt-collectors/> [as of May 1, 2013].)

In further response to the above issues, this bill, sponsored by Attorney General Kamala Harris, seeks to make numerous changes relating to debt buyers, including prohibiting a debt buyer from making a written statement to collect a consumer debt without possessing specific information, requiring a complaint in an action to collect on a consumer debt to include specific allegations, and prohibiting a debt buyer from bringing suit if the applicable statute of limitations has expired.

This bill was approved by the Senate Committee on Banking & Financial Institutions on April 17, 2013, by a vote of 8-0, and is similar to SB 890 (Leno, 2011), which was approved by this Committee but failed passage in the Assembly Committee on Banking & Finance.

## CHANGES TO EXISTING LAW

1. Existing federal law generally regulates the collection of debt through, among other things, the Fair Debt Collection Practices Act, Fair Credit Reporting Act, and the Gramm-Leach-Bliley Act.

   Existing state law, the Rosenthal Fair Debt Collection Practices Act, generally prohibits deceptive, dishonest, unfair, and unreasonable debt collection practices by debt collectors, and regulates the form and content of communications by collectors to debtors and others.  (Civ. Code Sec. 1788 et seq.)

   This bill would establish the Fair Debt Buying Practices Act and prohibit a debt buyer from making any written statement to a debtor in an attempt to collect a consumer debt unless the debt buyer possesses the following information:
   - the debt buyer is the sole owner of the debt or has authority to assert the rights of all owners of the debt;

SB 233 (Leno and Correa)
Page 4 of 12

- the debt balance at charge off and an explanation for all post-charge-off interest rates and fees, if any, imposed by charge-off creditor or any subsequent purchasers of the debt;
- the date of default or date of the last payment;
- the name and address of the charge-off creditor at the time of charge off, and the charge-off creditor's account number associated with the debt;
- the name and last known address of the debtor as they appeared in the charge-off creditor's records prior to the sale of the debt; and
- the names and addresses of all persons or entities that purchased the debt after charge off, including the debt buyer making the written statement;

This bill would prohibit a debt buyer from making any written statement to a debtor in an attempt to collect a consumer debt unless the debt buyer has access to a copy of the contract or other document evidencing the debtor's agreement to the debt. If the claim is based on debt for which no signed contract or agreement exists, the debt buyer shall have access to a copy of a document provided to the debtor while the account was active, demonstrating that the debt was incurred by the debtor.

This bill would require a debt buyer to provide the information or documents identified above to the debtor without charge within 15 calendar days of receipt of a debtor's written request for information regarding the debt or proof of debt. If the debt buyer cannot provide the information or documents within 15 calendar days, the debt buyer shall cease all collection of the debt until the debt buyer provides the information or documents. A debt buyer must provide an active postal address to which these requests can be sent, and may provide an active email address to which these requests can be sent and through which information and documents can be delivered.

This bill would require a debt buyer to include a prominent statutory notice with its first written communication with the debtor that is in no smaller than 12-point type, as specified.

This bill would provide that when a debt buyer attempts to collect on a time-barred debt where the debt is not past the date for obsolescence, the buyer must provide the following notice: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it. If you do not pay the debt, [insert name of debt buyer] may [continue to] report it to the credit reporting agencies as unpaid for as long as the law permits this reporting." If the debt is both time-barred and past the date for obsolescence, the debtor shall provide the following notice: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it, and we will not report it to any credit reporting agency."

This bill would state that if a language other than English is principally used by the debt buyer in the initial oral contact with the debtor, the above-required notices shall be provided to the debtor in that language within five working days.

This bill would require all settlement agreements between a debt buyer and a debtor to be documented in open court or otherwise reduced to writing, and, the debt buyer shall ensure that a copy of the written agreement is provided to the debtor.

This bill would require a debt buyer that receives payment on a debt to provide, within 30 calendar days, a receipt or monthly statement to the debtor, as specified. A debt buyer that accepts a payment as payment in full, or as a full and final compromise of the debt, shall provide, within 30 calendar days, a final statement to the debtor. A debt buyer shall not sell an interest in a resolved debt or any personal or financial information related to the resolved debt.

This bill would prohibit a debt buyer from bringing suit or initiating an arbitration or other legal proceeding to collect a consumer debt if the applicable statute of limitations on the debt buyer's claim has expired.

This bill would provide that in an action brought by a debt buyer on a consumer debt, the complaint shall allege all of the following:
- that the plaintiff is a debt buyer;
- the nature of the underlying debt and the consumer transaction or transactions from which it is derived, in a short and plain statement;
- that the debt buyer is the sole owner of the debt at issue, or has authority to assert the rights of all owners of the debt;
- the debt balance at charge off and an explanation of the amount, nature, and reason for all post-charge-off interest and fees, as specified;
- the date of default or date of the last payment;
- the name and an address of the charge-off creditor at the time of charge off, and the charge-off creditor's account number associated with the debt;
- the names and addresses of all persons or entities that purchased the debt after charge off; and
- that the debt buyer has complied with specified requirements of this bill.

This bill would require a copy of the contract or other document that evidences the debtor's agreement to the debt to be attached to the complaint.

This bill would provide that the above requirements shall not be deemed to require the disclosure in public records of personal, financial, or medical information, the confidentiality of which is protected by any state or federal law.

This bill would provide that in an action initiated by a debt buyer, no default or other judgment may be entered against a debtor unless business records,

authenticated through a sworn declaration, are submitted by the debt buyer to the court to establish specified facts required to be alleged in the complaint.

This bill would prohibit a default or other judgment from being entered against a debtor unless a copy of the contract or other document, as specified, authenticated through a sworn declaration, has been submitted by the debt buyer to the court.

This bill would provide that in any action on a consumer debt, if a debt buyer plaintiff seeks a default judgment and has not complied with the above requirements, the court shall not enter a default judgment for the plaintiff and may, in its discretion, dismiss the action.

This bill would provide that in the case of an action brought by an individual or individuals, a debt buyer that violates any provision above with respect to any person shall be liable to that person in an amount equal to a sum of: (1) actual damages; and (2) statutory damages, which shall not be less than $100 nor greater than $1,000.

This bill would provide that, in the case of a class action, a debt buyer that violates any of the above provisions shall be liable for statutory damages for each plaintiff, and, if the court finds that the debt buyer engages in a pattern and practice of violating any provision of this bill, the court may award additional damages to the class in an amount not to exceed the lesser of $500,000 or one percent of the net worth of the debt buyer.

This bill would provide that, in the case of any successful action to enforce liability under this bill, the court shall award the costs of the action, together with reasonable attorney's fees as determined by the court.

This bill would allow reasonable attorney's fees to be awarded to a prevailing debt buyer upon a finding by the court that the plaintiff's prosecution of the action was not in good faith. This bill would also provide that a debt buyer shall have no civil liability if the debt buyer shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error, and occurred notwithstanding the maintenance of procedures reasonably adopted to avoid any error.

This bill would require an action to enforce any liability created by this bill to be brought within one year from the date of the last violation. This bill would further state that recovery in an action brought under the Rosenthal Fair Debt Collection Practices Act shall preclude recovery for the same acts in an action brought under this bill.

This bill would further provide that in a case involving consumer debt, as regulated by this bill, if the defendant debtor appears for trial on the scheduled trial date, and

the plaintiff debt buyer either fails to appear or is not prepared to proceed to trial, and the court does not find a good cause for continuance, the court may, in its discretion, dismiss the action with or without prejudice. The court may also award the defendant debtor's costs of preparing for trial, including, but not limited to, lost wages and transportation expenses.

This bill would additionally define "debt buyer," apply the above provisions to consumer debt sold or resold on or after January 1, 2014, and make related findings and declarations.

2. Existing law establishes a process for the enforcement of money judgments and requires a levying officer to provide certain documents and information to a judgment debtor and to a designated employer in connection with wage garnishment. Existing law permits a process server also to serve an earnings withholding order on an employer and requires that the process server also serve certain documents at this time. Existing law requires an employer who is served with an earnings withholding order to provide certain documents to an employee who is a judgment debtor. (Code Civ. Proc Secs. 700.010; 706.103; 706.104; 706.108; 706.122.)

This bill would require, in the circumstances described above, that a copy of the form that the judgment debtor may use to make a claim of exemption and a copy of the form used to provide a financial statement also be provided.

## COMMENT

1. Stated need for the bill

According to the author:

[T]he Federal Trade Commission [(FTC) has stated that], [t]he system for resolving disputes about consumer debts is broken, and has urged states to pass legislation to provide adequate protection for consumers.

The system is broken because courts have been swamped with debt collection law suits driven by the growth of an industry that buys and sells bundled portfolios of consumer debt, and misuses the courts to leverage their collection efforts.

The industry's practices echo the scandal surrounding the processing of delinquent mortgages. Here, debt buyers use "robo signers" who sign affidavits averring that they have reviewed and verified debtors' records, when they have only reviewed basic, and often incomplete, account statements records or spreadsheets on a computer screen. Moreover, because consumer debt is being bought and sold so frequently, and over a period of years, companies are

frequently pursuing the wrong person, or the filing claims that have no lawful basis.

Frequently, these debt collection actions are filed by debt buyers without proof that the debt ever existed. Yet actions proceed to judgment because ninety-five percent of consumers do not respond to these lawsuits — many because they do not receive notice — allowing the debt collector to take a default judgment against the consumer and levy against the consumer's personnel accounts.
. . .

The Fair Debt Buyers Act would reform the debt collection litigation process in a number of ways to aid consumers and unburden the courts from costly, unmeritorious litigation.

2. Implementing the FTC's recommendations

As noted above, the FTC recently released a comprehensive report entitled *Repairing A Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration* that contained recommendations for reforms similar to those proposed by this bill.

a. Complaints must include detailed information

The FTC found that complaints filed by debt collectors to initiate collection actions against debtors were lacking. The FTC's report noted that "[t]he function of debt collection complaints in a notice pleading system is to provide sufficient information so that: (1) consumers can determine whether to admit or deny the complaint allegations and assert affirmative defenses in their answers; and (2) judges can determine whether to grant a motion for a more definite statement or enter a default judgment . . . Based on the evidence gathered in connection with these proceedings, the FTC believes that many debt collection complaints do not provide this information to consumers." To address that issue, this bill would, among other things, enhance the complaint so that the debtor has more complete information regarding the debt at issue, and, in turn, is able to respond appropriately to the complaint.

Specifically, the bill would provide that in an action brought by a debt buyer on a consumer debt, the complaint must allege: (1) that the plaintiff is a debt buyer; (2) the nature of the underlying debt and the transaction from which it is derived; (3) that the debt buyer is the sole owner or has authority to assert the owners rights; (4) the debt balance at charge off and the reason for all post-charge-off interest and fees; (5) the date of the last payment; (6) the name and address of the charge-off creditor, and the creditor's account number; (7) the name and last known address of the debtor as they appear in the charge-off creditor's records; and (8) the names and addresses of all entities that purchased the debt after charge off. The complaint must also allege that the debt buyer

complied with this bill's requirement for debt buyers to possess specific information before making a written statement to a debtor in an attempt to collect the debt. Regarding the necessity of requiring additional information from debt buyers when they seek to collect upon debt, Consumers Union (CU), in support, contends that "[t]ens of thousands of Californians are contacted every year by debt buyers they have never done business with, for debts that may be old or in an amount that doesn't match the consumer's memory or records. The debt may even be owed by someone else or the result of identity theft. Yet some debt buyer[s] have little more than a robo-signed affidavit to back up their claims in court." To address the reported abuses, the detailed complaint requirements would appear to provide consumers with necessary information about the debt for which collection is attempted, and in turn, allow those consumers to file an appropriate answer to the complaint.

It is important to note that many of the complaints currently filed by some debt buyers are simply form complaints that provide little, if any, useful information to the consumer being sued about the underlying debt. Regarding the filing practices of some of those firms, the New York Times' October 31, 2010 article entitled *Debt Collectors Face a Hazard: Writer's Cramp* reported that:

> In some instances, banks are selling account information that is riddled with errors. More often, essential background information simply is not acquired by debt buyers, in large part because that data adds to the price of each account. But court rules state that anyone submitting an affidavit to a court against a debtor must have proof of that claim — proper documentation of a debt's origins, history and amount.

> Without that information it is hard to imagine how any company could meet the legal standard of due diligence, particularly while churning out thousands and thousands of affidavits a week. Analysts say that affidavit-signers at debt-buying companies appear to have little choice but to take at face value the few facts typically provided to them — often little more than basic account information on a computer screen. (Segal, *Debt Collectors Face a Hazard: Writer's Cramp* (Oct. 31, 2010) New York Times <http://www.nytimes.com/2010/11/01/business/01debt.html?pagewanted=all> [as of May 3, 2013].)

b. Disclosure of information prior to judgments

To ensure that the court has sufficient information about the underlying debt, this bill would prohibit a default or other judgment from being entered against a debtor until the debt buyer submits business records that have been authenticated through sworn declaration and establish specified facts regarding the debt. Specifically, those records must show proper ownership of the debt, the debt balance and reason for any post-charge-off fees, date of default or last payment, and the name and

address of the charge-off creditor, debtor, and all persons or entities who purchased the debt after charge-off. Furthermore, the debt buyer must also provide a copy of the contract or other document evidencing the debtor's agreement to the debt, authenticated through sworn declaration, prior to entering a default or other judgment against a debtor. As a result, the proposed requirements would appear to ensure that the court has relatively detailed information about the nature and history of the debt.

It should be noted that a large percentage of debt collection actions reportedly result in default judgments. Those judgments are entered in favor of the plaintiff (debt buyer) due to the failure of the defendant (consumer) to file a timely response to the complaint.

When those consumers fail to respond, there is no advocate to raise, on their behalf, applicable defenses or challenge the assertions made by the debt buyer. The FTC's report noted concern about the number of default judgments and recommended steps to "increase consumer participation in debt collection litigation to help decrease the prevalence of default judgments," and noted that "[i]n an effort to address this problem in another way, some court systems have adopted measures to encourage judges to apply appropriate and consistent standards – including legal standards and court rules – in deciding whether to grant such judgments." (*Repairing a Broken System* (July 2010) Federal Trade Commission <http://www.ftc.gov/os/2010/07/debtcollectionreport.pdf > [as of May 3, 2013] at p. 20.) The requirements discussed above essentially provide a set of consistent standards for a judge to use when granting a default judgment.

This bill would also provide that if a debt buyer seeks a default judgment and has not complied with the requirement of this bill, the court shall not enter a default judgment and may dismiss the action. Similarly, if a defendant debtor appears for trial and the plaintiff debt buyer fails to appear or is not prepared to proceed (and there is no good cause for continuance), the court may dismiss the action and award the defendant debtor's costs for preparing for trial.

c. Statute of limitations

The FTC's report also expressed concern that certain collectors "regularly sue consumers on time-barred debts." That practice is exacerbated by the practical reality that many consumers do not defend themselves against these suits, even when the action would be barred by the statute of limitations. The FTC further asserted that "[b]ecause an expired statute of limitations is an affirmative defense in most states, collectors have no obligation to allege in the complaint that the debt is not time-barred, and many collectors do not include this information. If consumers do not defend, there is no one to raise the defense that the debt is time-barred. Indeed, some judges who participated in the roundtables stated that, even if a debt collection action appears to be time-barred, it would be

improper for courts to consider affirmative defenses that no party had raised. As a result, some courts appear to be granting default judgments on time-barred debt." (*Repairing a Broken System* (July 2010) Federal Trade Commission <http://www.ftc.gov/os/2010/07/debtcollectionreport.pdf > [as of May 3, 2013] at p. 30.)

This bill would address those issues by, among other things, prohibiting a debt buyer from bringing suit or initiating an arbitration or other legal proceeding to collect a consumer debt if the applicable statute of limitations has expired, and requiring a debt buyer to notify a debtor if a debt is time-barred. Regarding the need to address the issue of time-barred debts, the Attorney General, sponsor, asserts:

> Industry practices have become a significant focus of public concern due to collection efforts being directed to the wrong consumer, or seeking the collection of debt that is time barred or has been paid. These concerns are compounded because a very high percentage of debt collection litigation results in default judgments where consumers do not appear to present whatever defenses may be available to them.

3. <u>Additional limitations on debt collection</u>

This bill would additionally prohibit a debt buyer from making a written statement to a debtor in an attempt to collect a consumer debt unless the debt buyer possesses specific documentation regarding the debt. The debt buyer must make that information available, without charge, to the debtor within 15 calendar days of receipt of a request. If the debt buyer cannot provide the information within that time frame, the debt buyer must cease all collection of the debt until the information is provided.

In support of the documentation requirements, AARP notes that "[t]he elderly are disproportionately victims of identity theft and are thus often targeted with lawsuits for debts they never obtained or authorized. . . . This legislation will provide crucial protections to ensure that the senior will not be subjected to this type of unwarranted harassment, requiring that debt buyers have essential information about a debt before they try to collect the debt and that the information be shared with the consumer on request. . . ."

4. <u>Remedies</u>

This bill would provide specific penalties and damages against a debt buyer who violates the above requirements. Specifically, the debt buyer would be liable to the consumer in an amount equal to the actual damages plus statutory damages (between $100 and $1000 per violation per person), and also would allow a prevailing debtor to receive reasonable attorney's fees and costs. This bill would

also provide that in any class action where a court finds that the debt buyer engaged in a pattern and practice of violating this bill, the court may award additional damages in an amount not to exceed the lesser of $500,000 or one percent of the net worth of the debt buyer.

It should be noted that this bill would also limit the liability of debt buyers if the buyer shows that the violation was not intentional and resulted from a bona fide error, and occurred notwithstanding the maintenance of procedures reasonably adopted to avoid any error.  That safe harbor provision would appear to shield debt buyers from liability in cases where the error was truly inadvertent.

5.  <u>Claim of exemption</u>

Under existing law, a judgment debtor can claim that his or her property or money is exempt from collection efforts.  Those claims may be filed with the levying officer within 10 days after the date the notice of levy was served on the judgment debtor, and must include a financial statement.  (Code Civ. Proc. Secs. 703.520, 703.530.)  To facilitate exemptions, this bill would require the levying officer enforcing a money judgment to also provide a copy of the forms that the judgment debtor may use to make a claim of exemption and provide a financial statement, as specified.

<u>Support</u>:  AARP; Center for Responsible Lending; Consumers Union; East Bay Community Law Center; Encore Capital Group; Public Law Center

<u>Opposition</u>:  None Known

**<u>HISTORY</u>**

<u>Source</u>:  Attorney General Kamala Harris

<u>Related Pending Legislation</u>:  SB 702 (Anderson) would require applications for default judgment to contain specified information.  This bill is set for hearing in this Committee on May 7, 2013.

<u>Prior Legislation</u>:  SB 890 (Leno, 2011) *See* Background.

<u>Prior Vote</u>:  Senate Committee on Banking & Financial Institutions (Ayes 8, Noes 0)

**************

# EXHIBIT F

*California*
LEGISLATIVE INFORMATION

| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

**AB-1526 Debt collection.** (2017-2018)

SHARE THIS:  

Date Published: 09/05/2018 09:00 PM

### Assembly Bill No. 1526

### CHAPTER 247

An act to amend Section 1788.14 of the Civil Code, and to amend Section 337 of the Code of Civil Procedure, relating to debt collection.

[ Approved by Governor  September 05, 2018. Filed with Secretary of State September 05, 2018. ]

### LEGISLATIVE COUNSEL'S DIGEST

AB 1526, Kalra. Debt collection.

The Rosenthal Fair Debt Collection Practices Act regulates the practice of debt collection and the conduct of debt collectors, as defined. The act prohibits specified conduct by a debt collector in connection with the collection or attempted collection of a consumer debt. The act provides for enforcement by means of civil penalties and damages, as specified.

This bill would prohibit a debt collector from sending a written communication to a debtor attempting to collect a time-barred debt without providing specified written notices stating that the debtor may not be sued for the debt, but that the debt, depending on its age, may be reported as unpaid to credit reporting agencies, as specified.

Existing law prescribes periods for commencement of various actions. Among others, an action must be commenced within 4 years if the action is to recover (1) upon a book account whether consisting of one or more entries; (2) upon an account stated based upon an account in writing, but the acknowledgment of the account stated need not be in writing; or (3) a balance due upon a mutual, open and current account, the items of which are in writing. Existing law provides, however, that where an account stated is based upon an account of one item, the time shall begin to run from the date of the item, and where an account stated is based upon an account of more than one item, the time shall begin to run from the date of the last item.

This bill would specify that when the 4-year period in which an action must be commenced has run, no person may bring suit or initiate an arbitration or other legal proceeding to collect the debt. This bill would provide that the period may be extended only in specified circumstances.

Vote: majority   Appropriation: no   Fiscal Committee: no   Local Program: no

### THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

**SECTION 1.** Section 1788.14 of the Civil Code is amended to read:

**1788.14.** No debt collector shall collect or attempt to collect a consumer debt by means of the following practices:

(a) Obtaining an affirmation from a debtor of a consumer debt which has been discharged in bankruptcy, without clearly and conspicuously disclosing to the debtor, in writing, at the time such affirmation is sought, the fact that

the debtor is not legally obligated to make such affirmation:

(b) Collecting or attempting to collect from the debtor the whole or any part of the debt collector's fee or charge for services rendered, or other expense incurred by the debt collector in the collection of the consumer debt, except as permitted by law; or

(c) Initiating communications, other than statements of account, with the debtor with regard to the consumer debt, when the debt collector has been previously notified in writing by the debtor's attorney that the debtor is represented by such attorney with respect to the consumer debt and such notice includes the attorney's name and address and a request by such attorney that all communications regarding the consumer debt be addressed to such attorney, unless the attorney fails to answer correspondence, return telephone calls, or discuss the obligation in question. This subdivision shall not apply where prior approval has been obtained from the debtor's attorney, or where the communication is a response in the ordinary course of business to a debtor's inquiry.

(d) Sending a written communication to a debtor in an attempt to collect a time-barred debt without providing the debtor with one of the following written notices:

(1) If the debt is not past the date for obsolescence set forth in Section 605(a) of the federal Fair Credit Reporting Act (15 U.S.C. Sec. 1681c), the following notice shall be included in the first written communication provided to the debtor after the debt has become time-barred:

"The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it. If you do not pay the debt, [insert name of debt collector] may [continue to] report it to the credit reporting agencies as unpaid for as long as the law permits this reporting."

(2) If the debt is past the date for obsolescence set forth in Section 605(a) of the federal Fair Credit Reporting Act (15 U.S.C. Sec. 1681c), the following notice shall be included in the first written communication provided to the debtor after the date for obsolescence:

"The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it, and we will not report it to any credit reporting agency."

(e) For purposes of this section, "first written communication" means the first communication sent to the debtor in writing or by facsimile, email, or other similar means.

**SEC. 2.** Section 337 of the Code of Civil Procedure is amended to read:

**337.** Within four years:

(a) An action upon any contract, obligation or liability founded upon an instrument in writing, except as provided in Section 336a; provided, that the time within which any action for a money judgment for the balance due upon an obligation for the payment of which a deed of trust or mortgage with power of sale upon real property or any interest therein was given as security, following the exercise of the power of sale in such deed of trust or mortgage, may be brought shall not extend beyond three months after the time of sale under such deed of trust or mortgage.

(b) An action to recover (1) upon a book account whether consisting of one or more entries; (2) upon an account stated based upon an account in writing, but the acknowledgment of the account stated need not be in writing; (3) a balance due upon a mutual, open and current account, the items of which are in writing; provided, however, that if an account stated is based upon an account of one item, the time shall begin to run from the date of the item, and if an account stated is based upon an account of more than one item, the time shall begin to run from the date of the last item.

(c) An action based upon the rescission of a contract in writing. The time begins to run from the date upon which the facts that entitle the aggrieved party to rescind occurred. Where the ground for rescission is fraud or mistake, the time shall not begin to run until the discovery by the aggrieved party of the facts constituting the fraud or mistake. Where the ground for rescission is misrepresentation under Section 359 of the Insurance Code, the time shall not begin to run until the representation becomes false.

(d) When the period in which an action must be commenced under this section has run, a person shall not bring suit or initiate an arbitration or other legal proceeding to collect the debt. The period in which an action may be commenced under this section shall only be extended pursuant to Section 360.

# EXHIBIT G

Case 3:17-cv-02277-L-MDD   Document 22-3   Filed 06/06/19   PageID.700   Page 138 of 139

# Texas Legislature Online
# History

---

**Bill:** HB 996      **Legislative Session:** 86(R)      **Council Document:** 86R 8231 JES-F

**Last Action:**      *05/28/2019 E Sent to the Governor*

**Caption Version:**      Enrolled

**Caption Text:**      Relating to the collection of consumer debt by debt buyers.

**Author:**      Collier | Thompson, Senfronia | Longoria | Capriglione | Leach

**Sponsor:**      Paxton

**Cosponsor:**      Alvarado | Menéndez

**Subjects:**      Business & Commerce--General (I0050)
Consumer Protection (I0080)
Financial--General (I0365)
DEBT (S0116)

**House Committee:**      Pensions, Investments & Financial Services
**Status:**      Out of committee
**Vote:**      Ayes=9   Nays=0   Present Not Voting=0   Absent=2

**Senate Committee:** Business & Commerce
**Status:**      Out of committee
**Vote:**      Ayes=7   Nays=0   Present Not Voting=0   Absent=2

**Actions**: (descending date order)

Viewing Votes: Most Recent House Vote | Most Recent Senate Vote

| | Description | Comment | Date ▼ | Time | Journal Page |
|---|---|---|---|---|---|
| E | Sent to the Governor | | 05/28/2019 | | 6445 |
| S | Signed in the Senate | | 05/27/2019 | | |
| H | Signed in the House | | 05/26/2019 | | 6406 |
| H | Reported enrolled | | 05/24/2019 | 06:39 PM | 6144 |
| S | House concurs in Senate amendment(s)-reported | | 05/24/2019 | | 3200 |
| H | Text of Senate Amendment(s) | | 05/24/2019 | | 5163 |
| H | Statement(s) of vote recorded in Journal | | 05/24/2019 | | 5163 |
| H | Record vote | RV#1786 | 05/24/2019 | | 5163 |
| H | House concurs in Senate amendment(s) | | 05/24/2019 | | 5163 |
| H | Senate Amendments Analysis distributed | | 05/22/2019 | 06:16 PM | |
| H | Senate Amendments distributed | | 05/22/2019 | 06:15 PM | |
| H | Senate passage as amended reported | | 05/22/2019 | | 4831 |
| S | Remarks ordered printed | | 05/22/2019 | | 2503 |
| S | Record vote | | 05/22/2019 | | 2503 |
| S | Passed | | 05/22/2019 | | 2503 |
| S | Read 3rd time | | 05/22/2019 | | 2503 |
| S | Record vote | | 05/22/2019 | | 2503 |
| S | Three day rule suspended | | 05/22/2019 | | 2503 |

Exhibit G
Page 138

| | | | | |
|---|---|---|---|---|
| S | Vote recorded in Journal | | 05/22/2019 | 2503 |
| S | Read 2nd time & passed to 3rd reading | | 05/22/2019 | 2503 |
| S | Rules suspended-Regular order of business | | 05/22/2019 | 2503 |
| S | Not again placed on intent calendar | | 05/22/2019 | |
| S | Co-sponsor authorized | | 05/22/2019 | 2461 |
| S | Placed on intent calendar | | 05/21/2019 | |
| S | Committee report printed and distributed | | 05/20/2019 08:12 PM | |
| S | Recommended for local & uncontested calendar | | 05/20/2019 | |
| S | Reported favorably as substituted | | 05/20/2019 | 2281 |
| S | Considered in public hearing | | 05/16/2019 | |
| S | Left pending in committee | | 05/14/2019 | |
| S | Testimony taken in committee | | 05/14/2019 | |
| S | Considered in public hearing | | 05/14/2019 | |
| S | Scheduled for public hearing on . . . | | 05/14/2019 | |
| S | Referred to Business & Commerce | | 04/15/2019 | 1037 |
| S | Read first time | | 04/15/2019 | 1037 |
| S | Received from the House | | 04/11/2019 | 916 |
| H | Reported engrossed | | 04/11/2019 05:41 PM | 1602 |
| H | Statement(s) of vote recorded in Journal | | 04/11/2019 | 1531 |
| H | Record vote | RV#309 | 04/11/2019 | 1531 |
| H | Passed | | 04/11/2019 | 1531 |
| H | Read 3rd time | | 04/11/2019 | 1530 |
| H | Nonrecord vote recorded in Journal | | 04/10/2019 | 1489 |
| H | Passed to engrossment as amended | | 04/10/2019 | 1489 |
| H | Amended | 1-Collier | 04/10/2019 | 1489 |
| H | Read 2nd time | | 04/10/2019 | 1489 |
| H | Placed on General State Calendar | | 04/10/2019 | |
| H | Considered in Calendars | | 04/08/2019 | |
| H | Committee report sent to Calendars | | 04/04/2019 | |
| H | Committee report distributed | | 04/04/2019 03:43 PM | |
| H | Comte report filed with Committee Coordinator | | 04/04/2019 | 1327 |
| H | Reported favorably as substituted | | 04/01/2019 | |
| H | Committee substitute considered in committee | | 04/01/2019 | |
| H | Considered in formal meeting | | 04/01/2019 | |
| H | Left pending in committee | | 03/26/2019 | |
| H | Testimony taken/registration(s) recorded in committee | | 03/26/2019 | |
| H | Committee substitute considered in committee | | 03/26/2019 | |
| H | Considered in public hearing | | 03/26/2019 | |
| H | Scheduled for public hearing on . . . | | 03/26/2019 | |
| H | Referred to Pensions, Investments & Financial Services | | 02/25/2019 06:10 PM | 424 |
| H | Read first time | | 02/25/2019 | 424 |
| H | Filed | | 01/23/2019 | |